## UNITED STATES v. KIMS.
### No. 6786.

Circuit Court of Appeals, Ninth Circuit.

Nov. 7, 1932.

---

H. E. Ray, U. S. Atty., Ralph R. Breshears, Sam S. Griffin, and William H. Langroise, Asst. U. S. Attys., all of Boise, Idaho.

J. M. Lampert, B. W. Oppenheim, and J. B. Musser, all of Boise, Idaho, for appellee.

Before WILBUR and SAWTELLE, Circuit Judges, and NORCROSS, District Judge.

NORCROSS, District Judge.

This is an appeal from a judgment for plaintiff in an action upon a war risk term insurance policy.

Plaintiff (original name Jonas Kaminskis) was received in the United States Army June 2, 1918, and was honorably discharged June 16, 1919. On June 4, 1918, he applied for and was granted insurance in the amount of $10,000, and paid premiums thereon to include the month of June, 1919. The policy lapsed on July 31, 1919, unless, as alleged, plaintiff became permanently and totally disabled prior to that date.

Permanent and total disability is claimed by reason of auto-intoxication, intestinal acute; gastric ulcers, severe; and intestinal adhesions.

In the year 1914 plaintiff had an abdominal operation. Plaintiff testified that at the time of his examination by the Draft Board he complained of his stomach, and stated that he had previously been treated for a tumor. He further testified that during his service he had some discomfort and pain in the stomach region; that he was on sick call a number of times; that he was given C. C. pills for constipation, and his stomach was painted with iodine; that, he said, "was the biggest part of my treatment"; that when on sick call he was released from military duties; that for about two months he was trans-

ferred to the "development battalion," which he said consisted of men who were supposed to be off duty; that he was later transferred to the provost guard on regular duty; that he was excused from such guard duty many times on account of sickness.

According to the military records, plaintiff was in a hospital but twice, one day in July, 1918, for a sprained wrist accidentally incurred while drilling, and two days in the following month of August for acute intestinal autointoxication. He was discharged to duty on each occasion.

Just prior to his discharge from service, plaintiff was examined, and a finding made of no disability; the operative scar on his abdomen being noted. At that time plaintiff signed a statement that he had no disability. He testified this statement was not the fact, but that he signed the same because of his desire to get out of the Army.

On July 21, 1919, plaintiff was employed by the Simmons Bed Company at Kenosha, Wis., and continued in the employ of that company until December 17, 1920. During this time he was in the packing department, packing iron beds, averaging nearly fifty hours a week. His wage scale was 40 cents per hour at the beginning of his employment, but was increased, and averaged 60 cents per hour for the entire time of his employment. His total wages received during that time were $2,323.80, which was inclusive of a 6 per cent. payment to employees in addition to the regular wage scale.

Concerning his work for the Simmons Bed Company, the plaintiff testified: "I worked some days ten hours, some days eight hours, and some days fifteen hours. I did not work every day. I was sick in bed sometimes. I worked as long as I could. I was a regular employee of that company, and there was work there for me every working day if I wanted to work. I didn't work a full working day at times, because I did not feel good. I felt sick in my stomach. I asked my boss to let me go home and they let me go. I called for a physician at such times as I went home. The doctor was Dr. Palt. One season, I believe in the fall of 1919, I was sick in bed for two weeks; he (Dr. Palt) was in my house every other day, something like that. I went to the Doctor's office once pretty nearly every week, sometimes twice or more, and that continued throughout the time that I worked for the Simmons Bed Company. * * * I quit because I was sick and could not stand it any longer, the same ailment."

Dr. Palt testified that during the time of this employment he saw the plaintiff quite often; that he came to his office quite a number of times; that he could not state when he came to his office for examination, but "would say in a condition like he had once in every seven or eight days, for maybe two or three months."

The records of the Simmons Bed Company of the hours for which plaintiff was paid wages, by months, beginning with the month of July, 1919, are as follows: . 56, 278, 209, 180, 204, 163, 202, 153, 238, 222, 225, 195, 266, 234, 220, 259, 175, 145.

After leaving the Simmons Bed Company's employ, plaintiff returned to his trade as a barber, working for a Mr. Plaushines, remaining with the latter seven or eight weeks. His employer testified that plaintiff did not work steady; could not stand up; was suffering pain; "most of the time he goes to drug store, comes back tells me he has to go home." On cross-examination the witness testified: "When he started to work I watched him. When I saw him work I decided that he could do the work all right. He was a pretty fair barber. I had a two-chair barber shop at that time. Business was pretty good. He made around fifty dollars every two weeks, and I was able to take care of my business with Mr. Kims. Mr. Kims made sixty-five per cent of| what he took in, but he did not work full time. I couldn't pay him straight wages, just percentage. The time that Mr. Kims worked, we were able to take care of all our customers. * * * I didn't employ another barber to take his place after he left, because I thought I could take care of the business myself, and I couldn't get another barber. I just tried to take care of it myself, and my business dropped off immediately. I found that I couldn't handle it alone, but at the same time I had to handle it myself. I lost considerable business."

After leaving the employ of Plaushines, plaintiff testified he went to Chicago, where he was operated upon for rupture by Dr. Karalius, and was under his care for about three months. Thereafter for about two months plaintiff worked at his trade as a barber in the city of Chicago. He testified that, when so working, "every once in a while I got pains in my stomach and could not stand up. I was nervous." Plaintiff then went to a government hospital in Jackson Park, where he was placed on a "sippy" or vegetable diet. After remaining at that hospital for about two months, he was transferred to the Drexel Boulevard Hospital, where he was operated upon, and his gall bladder and ap-

pendix removed. After recovering from this operation sufficiently to enable him to walk, he was transferred to the Speedway Hospital, and was discharged therefrom some time early in 1923. About three months later plaintiff went to work as a barber in Chicago. He testified he worked part of the time until about May, 1925; that he did not work continuously every day; that for the first six months he worked upon Saturdays only because he could not stand steady work; he would quit sometimes during the working day because sick in the stomach and dizzy; that he received union wages, $30 a week, when he did work; that the reason he quit was because he could not stand the work; that he then went to Woodbridge, Wis., remaining there from May to October, 1925, when he returned to Chicago; that upon his return he was treated by Dr. Bertosh and was in Dr. Lendlahr's sanitarium for about three months upon a "sippy" diet; that from Chicago he went to Florida to get in a warm climate, remaining there from January to May, 1926, and while there treatment was prescribed by a Dr. McFadden; that from Florida he went to Rupert, Idaho, where he tried working in a hayfield pitching hay, became ill after four or five days, and was in bed for about two weeks. In June or July, 1927, plaintiff went to work in a barber shop at Rupert for a Mr. Short, where he was employed until August, 1931. He testified he did not work every day in the shop because he was sick, weak, got dizzy, and had pain in the stomach. After leaving Mr. Short's shop, plaintiff went to work in another barber shop in Rupert, where he was still employed at the time of the trial. He testified he had not worked every day while in the latter shop because he was sick. Bert Short, his employer for four years, testified:

"He did not work six days a week every week, nor did he work every week or every month during that time. I presume he lost about a third of his time off duty. He earned on.his sixty-five per cent basis, about eighteen dollars a week from June, 1927, until August, 1931. My earnings ranged from forty to fifty-five dollars a week. I had only two men working for me. The other man took in about the same as I did as a rule. He, plaintiff, went to Boise to the Veterans' hospital for two months in 1929. He was there three times while he worked for me."

Medical testimony offered on behalf of plaintiff was given by Dr. Joseph N. Palt, Dr. Louis S. Kackley, and Dr. Leland Frazier. Dr. Palt was one of the examining physicians for the Draft Board, and examined plaintiff before he entered the Army. He again examined plaintiff after he left the Army. His records were not available. Testifying from memory, he said: "His ailment was some gastric condition, something the matter with his stomach, which, at the time I diagnosed as ulcers of the stomach." The doctor expressed the opinion that at the time plaintiff was discharged from the Army he was permanently totally disabled. Upon cross-examination the attention of the witness was directed to a statement signed by the witness reading: "Kenosha, Wisconsin, June 8, 1922. This is to certify that Mr. Jonas Kaminiskis was a patient of mine June 26, 1919, to June 1, 1920. His ailment was gastric disorder; I diagnosed it as nervous dyspepsia due to army life. (Signed:) Joseph N. Palt, M. D."

The doctor further testified:

"Nervous dyspepsia includes quite a variety, or quite a lot of different symptom complexes. He might have a gastric ulcer; he might have a duodenal ulcer; he might have a tubercular condition of the stomach and distortion of the stomach, and it is all under one heading—nervous dyspepsia.

"If a man were continuously employed over a period of two years I would not call that total disability. If he were employed as a barber and as a laborer at the Simmons Bed Company over a period of two years, following a gainful occupation, I would not say that he was totally and permanently disabled."

Dr. Kackley testified he examined plaintiff in the summer of 1929 at Soda Springs, Idaho, and made a finding of gastric ulcer of the stomach; that it was a border-line ulcer, involved almost down to the back of the stomach, and involved the duodenum; that he prescribed a sippy diet and medicine to neutralize the acidity of the stomach, and, if possible, heal the ulcer; that he had treated the plaintiff more or less since then up to the present time; that his condition was not improved. The witness took four X-ray plates of plaintiff's stomach, two in the summer of 1929 and two in August, 1931. The plates were taken after giving the plaintiff a mixture of barium and meal. From the reading of the plates first taken he reached the conclusion plaintiff had an ulcer restriction of the stomach. Concerning the plates last taken, the doctor testified: "This shows the same construction found in the other one. By that I mean narrowing of the stomach. It indicates old ulcers, old scar tissue."

The opinion was expressed in answer to a hypothetical question that plaintiff was permanently and totally disabled and had been so from the time of his discharge.

Dr. Leland Frazier testified to first meeting plaintiff at Burley, Idaho, and making an examination of him at the request of the Veterans' Bureau in March, 1929. Another examination was made in June or July, 1929. As a result of these examinations, he recommended hospitalization for observation. Concerning an X-ray taken by him with the use of barium meal, he testified: "I also came to the conclusion that there was some reason why it was not a normal filling of the duodenal cap there. One reason can be there is an ulcer there. Another reason can be that there are adhesions in that region there. * * * My conclusion was, and I wrote it on my report, that he had a duodenal ulcer. * * * My diagnosis would be duodenal ulcer with adhesions—adhesions between the stomach and the lower end of the stomach in the first portion of the bowel, in the gall bladder region."

To the same hypothetical question propounded to Dr. Kackley, Dr. Frazier expressed the opinion plaintiff was permanently and totally disabled at the time of his discharge. The hypothetical question propounded to each of the two medical witnesses with reference to plaintiff's employment with the Simmons Bed Company contained the following statement: "He went to work on July 21st, or about that time, in 1919, for the Simmons Bed Company, and worked for them by the hour, not being regularly employed but mostly working days, and on one occasion for at least two weeks was in bed under direct treatment of the doctor for these ulcers of the stomach; that his condition continued, and this work continued until about December 17, 1920, at which time he left that employment because of inability to continue the work and the weakness and pains in the stomach."

Dr. Harry R. Feldott testified as a witness for defendant that he was a surgical examiner for the Veterans' Bureau; that he made an examination of plaintiff at Chicago on July 2, 1924; that his diagnosis in view of the history which plaintiff gave him was "post-operative scar, with deep seated adhesions; associated with that he had a chronic constipation"; that in his opinion plaintiff was not permanently and totally disabled at the time of his examination.

Dr. Charles L. Magruder testified for defendant that he made fluoroscopic and gastro-intestinal examinations of plaintiff in April, 1929, and again in April, 1930, as a result of which his opinion was plaintiff had a "stasis"—a "slowing up and hedging in of any portion of the intestinal tract"; that the plaintiff did not have an ulcer; that he found no evidence of ulcer; that the witness operated on plaintiff for hernia April 10, 1929; that with the fluoroscope you can watch the intestinal tract for five or ten minutes and really see what is wrong in that time. It means much more than the plate; that, if plaintiff had been suffering from an ulcer, he would have undoubtedly lost weight. Plaintiff in 1929 and 1930 was heavier than at the time of his acceptance in the service. At the time of the trial, plaintiff testified he weighed 120 pounds. His weight at the time of his admission into the army was 135 pounds. Dr. Magruder expressed the opinion that the plaintiff was not permanently and totally disabled when he examined and operated upon him in 1930, and that after his operation he could have followed continuously a substantially gainful occupation, without impairment to his health.

At the conclusion of the taking of testimony, defendant moved for a directed verdict, which was denied.

The question of law presented is the sufficiency of the evidence to require submission to the jury or to support the verdict.

We have here a case where the evidence discloses without conflict that slightly over a month after his discharge from the service the plaintiff entered upon a gainful employment and continued therein for a period of practically seventeen months, averaging in excess of eight hours per day for every working day during the entire period. Some special showing would have to be made which would warrant the conclusion that one so employed was, notwithstanding, permanently and totally disabled from following a gainful occupation during all or any portion of that time within the prescribed definition of permanent and total disability. Plaintiff testified that at one time he was absent from work and sick in bed for a period of two weeks. This testimony was the basis for a portion of the hypothetical question propounded to two of plaintiff's expert witnesses relative to his employment by the Simmons Bed Company. This statement is not corroborated by plaintiff's physician in charge at that time. By a reference to the

hours of employment by months, as shown by the Simmons Company records, it is difficult to account for an absence that could have exceeded one week.

While the medical expert testimony is generally in accord that plaintiff was suffering from intestinal adhesions, it is in conflict with respect to whether plaintiff was at any time after his discharge suffering from gastric ulcer or ulcers. The testimony is not conflicting, however, respecting the fact that such ulcers are not incurable.

Whatever conflict may exist in the testimony, it is a fact established without conflict that, beginning shortly after his discharge from the Army, plaintiff was employed by the Simmons Bed Company at a substantial wage, and remained continuously in that company's employ for approximately a year and a half, averaging more than eight hours per day for every working day during the entire period; that at the most he was incapacitated from work by reason of illness but for comparatively few days during that entire period. During that period he at times, if not continuously, suffered more or less pain or distress occasioned by an ulcer or ulcers in the stomach or from adhesions therein, or a combination of both. It is a fact, however, that such pain or distress, from whatever cause, did not seriously militate against his following his occupation substantially continuously during the entire period of his employment with the Simmons Bed Company. There is no testimony to the effect that the work in which he was engaged tended to aggravate his ailment or disease.

Plaintiff's right of recovery, if at all, is upon contract. He must establish permanent and total disability prior to the time his policy lapsed for nonpayment of premiums. Whatever may have been the effect of subsequent developments of his ailment or disease, the record of his employment with the Simmons Bed Company is such that he could not have been totally and permanently disabled within the definition of those terms during the time of such employment. This conclusion is in accord with the views expressed by this court in United States v. Seattle Title Trust Co., 53 F.(2d) 435, and United States v. Rice, 47 F.(2d) 749. The following cases also are in point: United States v. Harrison (C. C. A.) 49 F.(2d) 227; Ross v. United States (C. C. A.) 49 F.(2d) 541; Nalbantian v. United States (C. C. A.) 54 F.(2d) 63.

Judgment reversed.