## UNITED STATES v. HILL.
### No. 9543.

Circuit Court of Appeals, Eighth Circuit.

Jan. 12, 1933.

W. N. Ivie, U. S. Atty., G. T. Sullins and Virgil P. Wallace, Asst. U. S. Attys., all of Ft. Smith, Ark., and Cleveland Cabler, Atty., Veterans Administration, of Little Rock, Ark., for the United States.

Vernon Bankston, of Fountain Hill, Ark., and Cazort & Cronkrite, of Little Rock, Ark.; for appellee.

Before KENYON, GARDNER, and SANBORN, Circuit Judges.

SANBORN, Circuit Judge.

This is an appeal from a judgment entered upon the verdict of a jury in an action brought by the appellee upon a contract of war risk insurance. The parties will be designated as in the court below.

The defendant makes two contentions:

(1) That the court was without jurisdiction because no disagreement existed within the meaning of section 445, title 38, U. S. Code (38 USCA § 445).

(2) That if the court had jurisdiction, it should have directed a verdict for the defendant on the ground that the evidence was insufficient to sustain a verdict for the plaintiff.

1. This action was commenced before July 3, 1930, the date of the enactment of the amendment to section 445, title 38, U. S. Code (38 USCA § 445) 46 Stat. 992, which defined a "disagreement."

The plaintiff's claim was denied by the regional manager of the United States Veterans' Bureau at Little Rock, Ark., by letter of July 11, 1929, which advised him that the evidence of record was insufficient to warrant a total and permanent disability rating at any time subsequent to discharge, and which concluded: "This letter is accordingly evidence of a disagreement under Section 19 of the World War Veterans' Act, 1924, as amended." In view of section 426, title 38, U. S. Code (38 USCA § 426), requiring officers and employees of the bureau to perform such duties as are assigned to them by the Director, and of General Order No. 387 of June 6, 1929, authorizing regional managers to effect final denial of claims under war risk contracts, it seems clear that a disagreement existed, at the time this action was commenced, which required the court to assume jurisdiction. See Norton v. United States (D. C.) 57 F.(2d) 869; United States v. Burleyson (C. C. A. 9) 44 F.(2d) 502.

2. The plaintiff enlisted July 25, 1918, and was discharged May 24, 1919. He paid no premiums after discharge. His policy lapsed July 1, 1919. His discharge papers show that at the time of discharge he claimed some disability from rupture and rheumatism; the rupture having been incurred in October, 1918, and the rheumatism May 1, 1919. He was married on July 13, 1919. He

first applied for compensation in 1921, and subsequently made other applications. He was not granted compensation, the bureau having determined his disability to be less than 10 per cent. He brought this action in July, 1929, more than ten years after his discharge from the service. His claim is that he is now totally and permanently disabled as the result of chronic arthritis, and was so disabled when his contract of insurance was in force.

The defendant's claim is that the plaintiff is not now and never has been so disabled, but that he has had some disability due to a congenital defect of his feet which causes callouses or bunions.

The plaintiff's testimony is:

At Camp Pike, Ark., shortly after his enlistment, he had sore feet, which he attributed to ill-fitting shoes. He fell out on the march from Camp Merritt to the boat on account of his feet and his heart. He rested on the boat, and "held out" until October 17, 1918. He then took a hike, and his back and heart gave out. He was "crippled along" until November 7, 1918, and had to give up, and was held for an operation for hernia. At his own request, he was not operated on. He came home on May 24, 1919, and was not able to do anything at all; "crippled in my back, my feet and my heart, every time I would do any work it would run away. I was stooped over. It affected my head and back and seemed to want to draw me over." He was not able to gather the crop his brother had planted for him. In 1920, 1921, 1922, and 1923, he attempted to farm, with the help of his wife, a boy, his neighbors, and his brother. He was never free from pain. He was never able to do a day's work, but has worked some. He has not attempted to work since 1924. His condition has grown worse since 1924. When he was discharged, he was examined by a surgeon. "I only told them about this hernia, I didn't tell them about the rheumatism, I figured that to be usual and customary, and the hernia wasn't." In July, 1919, he thought his disease was serious, but that he would get over it, and he continued to think so until 1924. He had crops in the years 1920 to 1924. He ran for county treasurer in 1922. His wife taught school in 1924, but not before. In 1924 and 1925, he and his wife had a small store and filling station, and he waited on customers. His rheumatism developed prior to 1922. He had it while in the army, but it has gotten worse. "In 1922 was the first time that it completely knocked me out, I couldn't walk. I couldn't get out of bed." On March 17, 1923, he made an affidavit which he states is true to the best of his knowledge at that time. It reads in part as follows: "On or about January 1, 1922, I developed such a case of rheumatism, seemingly muscular in form, as that on or about the last of April of said year I was forced to take to my bed where I remained in bed and in and about the house for three months, part of which time I was unable to stand up; since that time I have been able to walk about fairly well considering the bunyans on my feet and my nervous condition as a result of said rheumatism, but I have not been able to do any work on my farm or anywhere else, and I am, therefore, ruined financially. My case is rheumatism, I know now since it has developed to the condition I am now in, has continued a slow development since I was in the army, and it is due to exposure and hardships undergone while in said service. Connected with hernia, about which I have filed affidavits and proof formerly, and bunyans on my feet, about which I have also formerly made proof, I am ruined physically."

In 1921, when he made application for vocational training, he stated in his application that his disability was rupture and bad feet incurred in France; that he was working for himself making a bare living; that he was not physically fit to do farm work; and that he did not know of any work he could do except teaching school.

The record contains the testimony of lay witnesses, usual in such cases, as to the plaintiff's being in a more or less disabled condition after his return from the army; much of it relating, however, to the period after 1922.

Three physicians testified for the plaintiff:

Dr. W. N. Chavis, on direct examination, stated that he examined the plaintiff just after he returned from the army, but did not examine him closely; that the plaintiff was suffering with rheumatism and with his feet; that he prescribed for the plaintiff, and that the plaintiff came back two or three times that year. The doctor said: "I don't think he was able to work in June when I saw him; I thought he was disabled to work, told him so, advised him not to try to work, and I don't know whether he did or not. I would consider it that he is totally and permanently disabled when I saw him, and of course the same way now. I saw him when he first came out of the army, and I expect the next time was in 1929. In 1928 or 1929 he was worse than he was when I first saw him. He had a very bad heart and rheumatism, and bad feet."

On cross-examination, the doctor identified his own affidavit made April 20, 1923, containing this statement with reference to the plaintiff: "I think it likely that the disability resulted from military service, because I know that prior to his service he was a strong, robust, healthy man. While I never examined him since his discharge until today, I know that he has been complaining of the hernia and bunions for a good long while. I have never treated him since his discharge from the service."

The doctor virtually admitted the truth of the statements contained in the affidavit.

Dr. E. L. Miller testified that he examined the plaintiff in 1921 or 1922; he is not sure which. His examination revealed trouble with the feet, a rapid heart, and blood pressure of about 160. Based upon his examination and the history the plaintiff gave him, he was of the opinion that the plaintiff was at that time totally and permanently disabled. He expressed no opinion as to the degree of the plaintiff's disability at the time of discharge.

Dr. A. G. Cazort testified that he examined the plaintiff on November 15, 1929, and found arthritis of the sacroiliac joint, "a process by which the two parts of bone that come together were being dissolved," and "myocarditis or inflammation of the heart muscle, causing a rapidly beating heart and an enlargement of the heart." He stated that it was his opinion that in May, 1919, the plaintiff was totally and permanently disabled. On cross-examination, he testified as follows:

"I am unable to say what this arthritis was caused from. I do not know how long it has been in progress except from the history given. I hardly think all of the history and symptoms that have been testified to here today could have occurred from many other diseases. I think that a man could have callouses on his feet and not have arthritis. Being stooped over and limping would be the first cause we would look to, we don't always find it, but we found it in this case. He could have a fast heart and still not have arthritis. There is not any particular fact that leads me to believe that he had arthritis in 1919. It is a combination of the facts as outlined, and the very fact that we do find this condition existing in 1929, and that fact that we know that the condition is long lifed, when diagnosed it has a long history behind it. That is chronic arthritis distinguished from acute arthritis. From the examination of November 15, 1929, we found arthritis. That is an inflammation of the joints broadly speaking, and it may take those classifications as two forms, erosion or dissolving which deforms the bone. It will cause the joint to enlarge, and stiffening in the hypertrophy but not in the erosive.

"In my statement from my examination in 1929 that plaintiff was totally and permanently disabled in May, 1919, I had taken the history of the case, the evidence outlined by the condition as pictured to me by these men who have known him, my conclusion is that the arthritic process existed in May, 1919. It is my opinion that the condition had reached the extent at that time of rendering him totally and permanently disabled. By incipient stage I mean the beginning, arthritis must have a beginning. Chronic is simply a long drawn-out process and acute begins apparently at once. Plaintiff's condition is chronic, according to the evidence given. I ascertained his condition from an X-ray picture, and at the time of this examination, November, 1929, I suspected that condition or I would not have had the X-ray made, and this X-ray picture confirms the condition as I have testified, that it was chronic arthritis, wasting away of the bone."

In order to recover upon his policy of war risk insurance, it was necessary for the plaintiff to establish, by substantial evidence, that, prior to its lapse for nonpayment of premiums, he was suffering from some physical impairment which prevented him from carrying on continuously a substantially gainful occupation, and that this impairment was based upon such conditions as then rendered it reasonably certain that it would continue throughout his life. A total disability which had not become permanent, or a permanent disability which had not become total, during the life of his policy, would not mature it. Eggen v. United States (C. C. A. 8) 58 F.(2d) 616, 618; Proechel v. United States (C. C. A. 8) 59 F.(2d) 648, 652; United States v. Harth (C. C. A. 8) 61 F. (2d) 541, 546.

The plaintiff's own evidence and that of his lay witnesses indicated that he did not continuously follow any substantially gainful occupation after his discharge from the service, and that he was unable to do so.

To establish that his disability was, prior to July 1, 1919, based upon conditions which rendered it reasonably certain to last throughout his life, he relies upon the expert opinions of Dr. Chavis and Dr. Cazort.

Dr. Chavis not only fails to point out any conditions which in the spring of 1919 made

it reasonably certain that whatever disability the plaintiff had would be permanent, but his affidavit of April 20, 1923, completely discredits his testimony given upon direct examination, and destroys the basis for his opinion that the plaintiff was totally and permanently disabled at the time he first claimed to have examined him in 1919.

Dr. Cazort's first examination was made in 1929, and the basis for his opinion that the plaintiff was totally and permanently disabled in May, 1919, is based upon his examination and the testimony of the plaintiff and his lay witnesses. He makes what might be termed a long-range retroactive diagnosis. He says that in his opinion the plaintiff had a case of arthritis so far advanced at the time of his discharge as to be incurable. Obviously, the doctor's opinion is little better than a mere guess. He says that chronic arthritis is arthritis of long standing. If it was incurred May 1, 1919, as the plaintiff apparently stated at the time he was discharged, it was only sixty days old on July 1, 1919. If it existed at the time his feet became sore at Camp Pike, Ark., in the summer of 1918, it was approximately one year old at the time his policy lapsed.

The plaintiff's testimony to the effect that he did not get well, but got worse, has some tendency to show that his disease was incurable from the beginning; but it is equally consistent with the theory that it was not then incurable, but became incurable because of neglect after his policy lapsed, or, during the slow progress of the disease, due to a lack of proper treatment and the nature of the disease combined.

█ It has been held that evidence which is contrary to the physical facts or which is obviously false, is not substantial evidence. Missouri, K. & T. Ry. Co. v. Collier (C. C. A. 8) 157 F. 347, 353; American Car & Foundry Co. v. Kindermann (C. C. A. 8), 216 F. 499, 502; United States v. McGill (C. C. A. 8), 56 F.(2d) 522, 524; United States v. Harth (C. C. A. 8) 61 F.(2d) 541, 544; Storey v. United States (C. C. A. 10) 60 F. (2d) 484, 486; F. W. Woolworth Co. v. Davis (C. C. A. 10) 41 F.(2d) 342, 347; Larabee Flour Mills Co. v. Carignano (C. C. A. 10) 49 F.(2d) 151, 153; Nicolay v. United States (C. C. A. 10) 51 F.(2d) 170, 173. See 8 A. L. R. 798.

In United States v. Perry (C. C. A. 8) 55 F.(2d) 819, 822, this court said: "When testimony of witnesses is shown by the physical facts to be impossible, an appellate court is not powerless to act, if such testimony is the only evidence to sustain a trial court's judgment where a jury is waived. A judgment based on evidence that cannot be true cannot stand, and evidence that cannot be true is not substantial evidence."

In Spear v. Hiles, 67 Wis. 361, 30 N. W. 511, 514, the court said: "But, in view of the facts that it is common knowledge that there are numerous causes for physical, mental, or nervous deficiency in children; that healthy women do sometimes give birth to deficient children; that nervous or otherwise unhealthy women often bear healthy children; and that Dr. Robinson detected no defect in the plaintiff's child until it was nearly a year and a half old,—we think the authorized limits of expert testimony was greatly exceeded when he was allowed to give his opinion that the deficiency in the plaintiff's child was caused by the nervous prostration of the plaintiff during her pregnancy. The testimony should have been excluded."

In Bucher v. Wisconsin Central Ry. Co., 139 Wis. 597, 120 N. W. 518, 521, it was said: "The verdict of a jury founded upon facts is entitled to great weight, and is almost conclusive upon this court if supported by any evidence. But the verdict of a jury founded only upon the opinion of experts concerning the cause of a condition, which condition is itself established by the opinion of experts, has no such weight. As was said in Baxter v. [Chicago & N. W.] Railway Co., 104 Wis. 307, 330, 80 N. W. 644, 652: 'Opinion evidence alone is not conclusive in any case. The jury must pass upon the probabilities, and, unless the opinion relied on is within the scope of reason and common sense, it should not be regarded at all.' Johnson v. Great Northern Ry. Co., 107 Minn. 285, 119 N. W. 1061."

And on page 522 of 120 N. W., 139 Wis. 597: "So that obvious error of opinion, opinion based on insufficient data, or nonsense clothed in words of 'learned length,' may be disregarded by this court as a basis for supporting a verdict."

See, also, United States v. Kerr (C. C. A. 9) 61 F.(2d) 800, United States v. Kims (C. C. A. 9) 61 F.(2d) 644; Hardy-Burlingham Mining Co. v. Baker (C. C. A. 6) 10 F.(2d) 277.

Necessarily, the weight of the opinion of an expert depends largely upon the facts upon which it is based. If supported by the evidence and by reason and common sense, it may carry great weight. If not justified by the evidence or by reason, it is entitled to no weight. Within reasonable limits, the weight

of expert opinion is for the jury; but, if opposed to undisputed facts, common knowledge, and reason, it will not support a verdict. It is safe to say that an opinion rises no higher than the level of the evidence and the logic upon which it is predicated.

In 22 C. J., page 733, the text-writer says: "But the judgment of an expert, when opposed to undisputed facts and the dictates of common sense, will not support a verdict, and the court should not permit the jury to be influenced by evidence on which they could not, within the laws of correct reasoning, make a finding."

We are satisfied, from examination of the record in this case, that the facts established by the plaintiff's evidence, taking that view of it which is most favorable to the plaintiff, are consistent not only with a hypothesis that whatever disability he had prior to July 1, 1919, was based upon conditions which then rendered it reasonably certain that it would continue throughout his life, but also with a hypothesis that it was not based upon such conditions, and that they therefore tended to establish neither hypothesis, but left the question of the permanency of his disability during the life of his policy purely in the realm of conjecture. See Eggen v. United States, supra; Nicolay v. United States, supra; Hirt v. United States (C. C. A. 10) 56 F.(2d) 80; United States v. Rentfrow (C. C. A. 10) 60 F.(2d) 488; Gunning v. Cooley, 281 U. S. 90, 50 S. Ct. 231, 74 L. Ed. 720.

The judgment is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.