## DIFFERENTIAL STEEL CAR CO. v. MAC-DONALD et al.

### No. 10925.

United States Court of Appeals
Sixth Circuit.

Feb. 17, 1950.

Robert C. Dunn, and Ross W. Shumaker, Toledo, Ohio (Shumaker, Loop, Kendrick & Winn, Robert C. Dunn, Toledo, Ohio, on the brief), for appellant.

McKeehan, Merrick, Arter & Stewart, Peter Reed, C. M. Horn, Edward D. Crocker, Cleveland, Ohio, for appellees.

Before SIMONS, McALLISTER, and MILLER, Circuit Judges.

McALLISTER, Circuit Judge.

Appellant contracted with the Republic of Bolivia to build two motor rail cars, according to certain specifications, for use on a government railroad in that country. The cars were built and shipped to Bolivia, but the Bolivian government refused to accept them on the ground that they did not meet specifications and warranties, and completely failed in operation.

Appellees were agents of appellant, and will hereafter be referred to as Macdonald, individually, one of the partners, whose firm bears his name. Under the laws of Bolivia, resident agents of a foreign corporation are required to guarantee performance of contracts made with the government. Macdonald as such resident agent in Bolivia, accordingly, guaranteed performance of ap-

pellant's contract. Subsequently, when the government claimed failure of performance and breach of contract, appellant refused to return the purchase price or pay damages. Macdonald was thereafter required to pay back to the Bolivian government the money which had been paid to appellant by the government, together with damages resulting from the breach, amounting, in all to $127,519.73. Macdonald then asked his principal to reimburse him for what he had paid on account of appellant's breach of contract, and upon refusal, brought this suit.

The case was tried before a jury, and after three weeks of testimony, at the conclusion of the proofs, the district court directed a verdict for the plaintiffs. From judgment entered on the verdict, the Differential Steel Car Company appeals. Appellant's principal claims of error are that the district court should have directed a verdict in its favor; that, failing to do this, it should have submitted the case to the jury on issues of disputed fact; that it improperly excluded evidence of a parol agreement made prior to the execution of the written contract; that it erred in refusing to permit the introduction of expert testimony, as well as other evidence; and that, contrary to law, it permitted rescission of the sale of the property more than three years after delivery and payment of the purchase price.

For an understanding of the relation of the parties and the issues, an outline of the factual background of the controversy may be helpful.

The South American republic of Bolivia is located high in the Andes Mountains. It is completely landlocked, being separated from the Pacific Ocean on the west by a narrow strip of Chilean territory only a few miles in width. From this frontier, the land rises, to the east, in successive ranges of mountains until it reaches the tableland of the Alto Plano, a high plateau 14,000 feet above sea level. This plateau stretches for approximately 200 miles more inland. The capital and principal city, La Paz, as well as the populated industrial part of the country, is situated on this plateau and within the ranges of the higher mountains.

Here is located the main part of the Potosi-Sucre Railroad, which runs from Sucre, 9,000 feet above sea level, to the Pilcomayo River, 7,700 feet above sea level, and thence to Potosi, more than 13,000 feet above sea level, in the tin and silver mining region of Bolivia. This railroad, owned by the Bolivian government, is 109 miles in length, with steep mountain grades and sharp curves.

The vehicles operated on the railroad are so-called rail cars, similar to streetcars, in which the electric motive power is replaced by gasoline engines of the type used in automobiles. Formerly the International Harvester Company in this country had supplied these cars for the Bolivian government. Appellee Macdonald had, in prior years, acted as agent for the Harvester Company in the sale and in the delivery of the cars to Bolivia. It appears that certain parts of the cars had been manufactured by appellant, Differential Steel Car Company, for the International Harvester Company, and in 1940, when the Bolivian government wanted additional rail cars, the International Harvester Company advised Differential that it was not then interested in the business and suggested that Differential try to secure it. Differential, accordingly, wrote Macdonald, who had theretofore been International Harvester's representative and agent, that it was in a position to supply the rail cars to Bolivia through Macdonald.

Sometime thereafter, in the following year of 1941, the president of Differential made a trip to Bolivia and requested Macdonald to arrange a meeting with the Bolivian officials who were in charge of the railroad, and also asked him to investigate the performance of the rail cars previously delivered by International Harvester. While the president of Differential was in Bolivia, the government decided to go ahead with plans to purchase additional equipment, and issued a call for bids on two rail cars, to be placed by August, 1941. The call for bids provided that the rail cars be constructed according to certain traction specifications. After describing the railroad over which they would be operated and the temperatures and con-

ditions which would be encountered, the necessary requirements were explicitly set forth as follows: "The train should travel the longest slope of 50 Km with grade of 30 o/oo and curves of radius equal to or over 76 m, with a minimum speed of 40 Km per hour. The maximum speed (over level and straight portions) to be 60 Km per hour."

Macdonald advised the Differential Company of the call for the bids and sent it a copy of the specifications (including the traction requirements) issued by the Bolivian government, as well as blueprints showing a cross-section and profile of the line over which the cars were to be operated.

Differential had never before attempted to build such rail cars. It was a new experiment for appellant company and it was, therefore, necessary for it to work out all the engineering details on the rail cars and determine the price it would charge. However, in September, 1941, it submitted a proposal to the Bolivian government and sent it on to Macdonald for presentation. It was addressed to the Potosi-Sucre-Camiri Railroad, and offered to furnish two rail cars, in accordance with attached specifications, at a price of $26,600 each F.A.S. New York. The specifications were prepared by Differential and were explicit as to weight and performance of the cars, setting forth that the weight of each car would be approximately 26,000 pounds and that "when all four engines are operating, the motor car and one trailer will negotiate the 30 o/oo grade when in over-drive with a small margin allowed for acceleration if the engines are maintained in good condition. Under normal conditions there will be ample power for accelerating while on the 30 o/oo grade with the engines in direct gear. In fact, the calculations indicate that the motor-coach will be capable of pulling two trailer cars with all coaches fully loaded up a 30 o/oo at 40 Kph. (24.8 m.p.h.) * * * These engines are of the highest quality and of ample capacity so that it will not be necessary to operate them above 2800 revolutions per minute *to meet the specified performance.*" (Emphasis supplied.)

In December, 1941, the Bolivian government notified Macdonald that Differential's bid was accepted and that it was in order to prepare and sign a formal contract. Macdonald cabled to Differential to this effect, and asked if he should sign such contract, whereupon Differential, by return cable, directed him to do so. Thereafter, a formal written contract for the sale of the rail cars was prepared and executed by the proper officials of the Bolivian government and by Macdonald, on behalf of Differential. It included the traction specifications set forth in the call for bids, and also embodied in the terms of Differential's successful bid. The contract was registered with the proper official in Bolivia, in accordance with the law of that country, and a copy sent to Differential. Thereafter, the rail cars were built and shipped by Differential.

The contract provided that there would be a provisional acceptance of the cars at the port of entry, and a final acceptance after the cars had proceeded under their own power up the mountains to Sucre.

When the cars arrived in Bolivia, the authorities considered it advisable to give them a brief test on a level stretch of track before starting on the long climb up the steep slopes of the Andes to the Alto Plano. After the cars had been driven between five and ten miles on the level stretch, the engines became exceedingly hot, and the fan belts stretched so that they were merely slipping and not operating the fans. The belts were then adjusted and the trip continued, but came to a stop when the propellor shafts were found to have become cracked, and the gear boxes broken, causing metal to be strewn along the track. The cars were then towed back to the point where the test had started and a thorough inspection made in a railway shop. Five of the eight gear boxes on the two cars were found to be so badly cracked as to be unusable; two propeller shafts were damaged so completely as to require replacement, and one engine had become "frozen." It then became necessary to tow the rail cars by steam locomotive from the base of the Andes to a town in Bolivia 13,000 feet

above sea level for repairs. While some parts were welded, others were required to be replaced by shipments from America. Such replacements were eventually made and certain supports constructed so that the long steel shafts would not weigh so heavily on the gear boxes, which was the probable cause of their breaking. In spite of the repairs and modifications to support the shafts and cure the defects, the cars utterly failed to operate according to specifications. The engines would overheat, even though they were not towing the specified weight of passengers, baggage, and trailer cars.

From the time the cars arrived in Bolivia and the first tests were made, Macdonald was in continual correspondence with Differential, advising of the condition of the cars, asking for repairs and replacements, and discussing the difficulties and possible means of surmounting them. Moreover, Macdonald urgently called upon Differential to send a responsible representative, or somebody to remedy the defects in the cars, and between January, 1945, and August, 1946, made thirteen separate requests for appellant to have someone come down to Bolivia to help remedy the situation. The Bolivian government was at the time on the point of commencing legal proceedings against Macdonald and Differential for damages, including repayment of the purchase price, as well as the sum of 5% per month from the date of delivery (in accordance with a provision in the contract), and damages for loss of revenue. Macdonald carried on continuous negotiations with the government, requesting that it withhold legal action until he could go to the United States and attempt to have Differential take some action in respect to the cars. The government eventually asked for return of the price of the rail cars, plus freight paid, together with $50,000 damages, which Macdonald afterward persuaded it to reduce to $15,000. According to the evidence, it would have been impossible to secure better terms of settlement; and Differential refused to make any effort to negotiate or discuss the matter. The cars were never accepted by the government, as accep-

tance was conditioned upon the cars proceeding under their own power up the mountains to Sucre, which they were never able to do.

In September, 1946, the government agreed in writing to withhold action in order to give Macdonald time to travel, at his own expense, to the United States to propose two alternatives to Differential: that Differential should promise to make the rail cars operate within a reasonable time, in which case the government would drop all claims for delay and other damages; or, if Differential could not put the cars into operation, the government would return them on condition that Differential would refund the purchase price and shipping charges paid, plus $15,000 as liquidated damages. It was further provided that if Differential refused to carry out either of the above alternatives, Macdonald would take back the cars and pay the government the purchase price and the agreed liquidated damages.

During the following month, November, 1946, Macdonald traveled by air to the United States to see the head of Differential, and submitted to him the proposals for settlement of the dispute. Differential, however, refused to have anything further to do with the matter, except to repeat suggested modifications in the cars, which had already been carried out by Macdonald with no effect.

In December, 1946, Macdonald, through legal counsel, made formal tender to Differential of the defense of claims being asserted by the Bolivian government, to which Differential responded by refusing to accept or undertake any defense of such claims.

Thereafter, on April 29, 1947, the Bolivian government, refusing to delay the matter any longer, issued a Supreme Resolution against both Differential and Macdonald.

A Supreme Resolution, under Bolivian law, is issued in an administrative proceeding, in cases involving claims by the government against an individual, arising out of contract. The individual in such a case is entitled to a full and complete

judicial review of the entire matter involved therein before the Supreme Court of Bolivia within a period of ninety days after notice of the entry of the Resolution.

The Resolution issued in this case declared that Differential had failed to comply with its contract in that the rail cars had not fulfilled the conditions specified in the written agreement; that Macdonald, as representative of Differential, had not received any payment, but was obligated as guarantor of Differential. Differential was ordered to return to the government the price of the rail cars, shipping costs, and $15,000 as liquidated damages within thirty days from the date of the Resolution; and the rail cars were to be returned. The Resolution also provided that if defendant did not make the above payment within thirty days, the sum thereof would be collected directly from Macdonald and, in such case, Macdonald would be subrogated to the rights of the government against Differential. Upon the execution of the Resolution, a certified copy was sent to Differential by counsel for Macdonald, and a separate copy was sent to Differential by the Consul General of Bolivia in New York. Differential replied to the letter of the Consul General by insisting that it had performed in every respect "its part of the contract with the Supreme Government of Bolivia." After the expiration of thirty days, Differential had failed to take any action to comply with the Resolution, and Macdonald was, therefore, required to pay to the Bolivian government the sum of $83,521.59, which he accordingly paid on June 4, 1947. Thereafter, Macdonald brought this suit against Differential for recovery of such payment and interest, together with commissions on the deal which were agreed to be paid to Macdonald by Differential. The rail cars are still in Bolivia. They are, for all practical purposes, worthless, and nobody wants them.

It is the claim of Differential that Macdonald was not its agent and representative in executing the contract with the Bolivian government, but was authorized by Differential only to present an offer on its behalf to the Bolivian government to manufacture and sell the rail cars in question, to be constructed according to certain specifications attached thereto, which offer, if accepted, would obligate Differential to such manufacture and sale, in accordance with the terms thereof. Further, Differential claims that it made no warranties or guarantees of mechanical performance of the rail cars; that, on the contrary, it specifically stated in its bid, the terms of which were subsequently included in the written contract, that it did not guarantee such performance; that any such guarantees were solely those of Macdonald, and were not binding on Differential, and that, consequently, he has no claim against Differential for having guaranteed the specified mechanical performance of the rail cars.

The foregoing contention leads to a number of incongruous declarations and claims on the part of Differential. It states that when the International Harvester Company concluded not to build any more rail cars for Bolivia, it "advised defendant (Differential) that it (the Harvester Company) was agreeable to having the *defendant deal directly with the government of Bolivia as to future orders.* * * *" Further, it is set forth in the brief of Differential that its president "was advised that under Bolivian law, *any offer he wished to submit to the government would have to be through a firm established in that country* * * *" and that "on or about December 27, 1941, *defendant's (Differential's) bid was accepted.* * * *"

 When the bid was accepted, Macdonald immediately asked for instructions by cable as to whether he should sign the contract, and was authorized by Differential, in a return cable, to sign it. Differential thereafter sent its congratulations on obtaining the order, and stated it trusted Macdonald had signed the contract, "according to the enclosed confirmation of cable." When the copy of this contract was sent on to Differential by Macdonald, in which it was expressly recited that the company was therein being represented by Macdonald, and was described as the seller, Differential wrote

him, congratulating him on the excellent manner in which the contract had been prepared. From all of these circumstances, it clearly appears that Macdonald was acting as agent for Differential in entering into the contract, and that his action therein was confirmed, ratified, and approved by Differential. Moreover, counsel for Differential, during the course of the trial in the district court, on various occasions declared repeatedly to the court that the contract for the sale of the cars was a contract between Differential and the government of Bolivia; that Macdonald, as agent, negotiated the contract, and, as agent, signed the contract on behalf of Differential; and that the contract was fully ratified and thereby became the contract of Differential. It may be observed also that the purchase price of $53,200 was paid directly by the government of Bolivia to Differential through an irrevocable letter of credit opened in a New York bank to the order of Differential, payable against shipping documents. Differential argues that because the contract was signed by "Macdonald & Co.— seller," this conclusively demonstrates that Macdonald was the party primarily liable on the contract. The fact is that in the contract itself, it is specifically recited that it is made between the Director General of Railroads of Bolivia "and the firm of Macdonald & Co. * * * representatives of the Differential Steel Car Co., Findlay, Ohio, which shall be called henceforth 'The Seller.'" It is abundantly clear that Macdonald acted only as an agent, and that the contract for the rail cars, as finally executed by Macdonald on behalf of Differential, was a contract between Differential and the government of Bolivia.

But Differential contends that, in any event, it did not guarantee the mechanical performance of the rail cars. The eleventh condition of the contract provides: "The seller, guarantees for the period of three months the correct mechanical performance of the railcars, and offers to adjust for their account anything wrong or any deficiency that presents itself in the en-gines and other parts, in relation to that specified in this respect."

The required mechanical performance was specified by the government of Bolivia in the call for the bids. Differential's bid contained the unqualified declaration that the rail cars it proposed to supply would meet these specified requirements. The contract executed by Macdonald on behalf of Differential provided for this specified performance. The seller's guarantee, as set forth in the eleventh condition of the contract, was also to this effect, and, on the trial, was stated by counsel for Differential to be the obligation of that company.

To substantiate further the conclusion that Differential guaranteed the performance of the cars, it seems that, after Differential had fully approved in writing the contract entered into on its behalf by Macdonald, including the guarantes of mechanical performance of the rail cars, Macdonald became concerned about the matter, inasmuch as he had made himself responsible to the Bolivian government for Differential's performance of the contract. He, therefore, asked for a definite statement in writing, signed by Differential, guaranteeing the mechanical performance of the cars. In response, Differential wrote Macdonald:

"Answering your letter of May 12th, 1942, we unhesitatingly guarantee that the motor cars will have sufficient power to 'climb a stretch of 50 kms. three-per cent grade, and curves with radius equal or greater than 76 meters, at a minimum speed of 40 kilometers per hour. Maximum speed, in a straight horizontal stretch, 60 kilometers per hour' at an elevation of 13,000 feet above sea level when pulling one trailer coach with a total loaded train weight of 64,000#.

"Trusting that this will remove from your mind all question of power; and that you will offer these trains to Cochabamba-Santa Cruz and F. C. Yungas with equal confidence."

With reference to the foregoing, the district court, in directing a verdict for

Macdonald, stated that "* * * this plaintiff had been pressing for an express agreement on the subject of the letter, in response to which the defendant, quoting from the original specifications of the Bolivian Government upon which it invited bids, *placed its own interpretation and construction upon the requirements of the contract with regard to the performance of the cars, and, as a matter of law, is bound by it.*"

With respect to the contention on the part of Differential that it clearly stated in its bid that it did not guarantee the mechanical performance of the cars and that this refusal to guarantee was specifically set forth in the contract, we find the claim without merit. In the bid and in the contract, there is a statement with reference to the technical matter of a power "curve," furnished by Chrysler Company, the manufacturer of the engines, and it mentions that it "shows the block test rating of the engine at sea level with throttle wide open and no accessories such as battery charging, fan or air compressor. This is the *usual type of curve* furnished with gasoline engines *with performance* under ideal conditions. *These performances* are not guaranteed." (Emphasis supplied.) It is obvious that the foregoing refers in no way to the mechanical performance of the rail cars. Moreover, subsequently, in the same paragraph, it is stated: "These engines are of the highest quality and of ample capacity so that it will not be necessary to operate them above 2800 revolutions per minute to meet the *specified* performance." The specified performance is that previously set forth in the contract, under the heading, "Specifications," and which was never met by the cars. Differential clearly guaranteed that performance in the contract.

It is contended by Differential that the trial court erred in excluding the testimony of an expert that, in his opinion, the rail cars had sufficient power to climb the mountains and curves of the specified grades when fully loaded and pulling a trailer coach, thus fulfilling the warranties made as to their mechanical performance.

The expert in question was the president of Differential, whose proffered testimony was to the effect that the rail cars had power to fulfill the warranty of mechanical performance in excess of that required, "according to Chrysler's test curves; we bought them for that horse power, and sold them for that horse power." The court rejected this and similar opinion evidence on the ground that it was contrary to the undisputed testimony of the actual fact that the rail cars did not have sufficient power to climb the mountains, as set forth in the warranty, and, in fact, entirely failed to run on their own power to Sucre, which was the first requirement for the acceptance of the cars by the government of Bolivia.

In this connection, it appears from the evidence that when Differential was attempting to find some explanation as to why the rail cars would not operate and what was wrong with them, it discussed the matter with the Chrysler Company, which had manufactured and supplied the engines, of a specified horse power rating and quality, but had not designed the rail cars. After going over the matter, Chrysler pointed out numerous errors in Differential's calculations as to the amount of horse power required for the cars, and called attention to the fact that the actual weight of the cars was much more than Differential had originally estimated, with the result that it greatly affected the mechanical performance of the cars. Furthermore, Chrysler declared that Differential had made errors in its altitude calculations for horse power, and with regard to deductions for transmission and muffler losses, inasmuch as it had not made any allowance for these important factors in its calculations. Observing that as a result of these discrepancies in calculation, the excess tractive effort at twenty-four miles per hour showed a reserve of power which did not exist, Chrysler stated that Differential's figures indicated that the train could be operated satisfactorily anywhere on the railroad with three C36 engines, whereas Chrysler's figures showed that, with three such engines, it would be impossible to operate the vehicles, "as has

been represented by Macdonald & Co." Chrysler then went on to inform Differential that in the opinion of the engineers that the officials of Chrysler had consulted in the matter, when a multiple engine installation of the type designed by Differential was used, engines of sufficient power should be selected so that the rail car could be operated on three engines and not require each of the four engines to operate at its maximum output continuously. "We presume," said Chrysler, "this was the intention of Differential Steel Car Company when this unit was designed; however, *this was not obtained because of apparent discrepancies in your calculations.* * * * After you have looked over the computations attached, *you will undoubtedly find that the application requires more power than you originally figured on, and undoubtedly this is one of the fundamental causes of your present difficulties.*" This would seem to dispose of the proffered expert testimony that, according to Chrysler's test curves, the rail cars had more power than was needed for their operative.

In the face of the foregoing, Differential nevertheless insists that the district court failed to give effect to the tests made in America, and "to the result of inspection in America as bearing upon the cause of any alleged *failure of performance* in South America." Appellant contends that the "tests in Findlay (Ohio) simulated operating conditions on the line in South America and the cars' performance was found to be satisfactory." The president of Differential had testified that the cars were operated in Findlay under conditions which, in his opinion, simulated operating conditions which would be met in actual use. It is further asserted that the rail cars were inspected and tested by Differential and found to comply with the provisions of the contract of sale.

The stipulations in the contract with regard to inspection provided that, when the cars were completed, they were to be inspected at the factory for strength and quality of materials used, by the Pittsburgh Testing Laboratories, on behalf of the Bolivian government. It appears that when the rail cars had been completed and a representative of the Pittsburgh Company arrived to inspect, one of the cars was loaded on a freight car, and the other was as yet unassembled. When Differential received the first report from the Pittsburgh Company stating that at the time of inspection, one of the cars had already been loaded on a freight car, the president of Differential replied that the report was in unsatisfactory form and thereupon wrote out a report himself which he insisted be signed by the Laboratories. He further stated that "no part of the *operation* is specified to be accepted by the testing laboratory," referring apparently to the fact that only strength and quality of materials was the subject of the test. He went on: "The customer does not expect the testing Laboratory to approve of the operation. *We have not attempted to improvise operating conditions at 10,000 to 15,000 feet elevation on long stretches of 3% grade on one curve after another. This testing and acceptance is provided in the contract to be accomplished after the railcars are put in service on the Potosi and Sucre Railroad in Bolivia.*" (Emphasis supplied.)

Although the foregoing evidence would seem conclusive as indicating that the failure of the mechanical performance of the rail cars was the result of Differential's discrepancies of calculations with respect to the power necessary for the required operation, and that no test of the cars had been made in America in which operating conditions like those in Bolivia had been simulated, nevertheless, consideration of this evidence is unnecessary to support the district court's conclusion refusing to admit the proffered testimony of Differential's president that, in his opinion, the rail cars would operate in accordance with the warranty of the contract. Such an opinion was in direct conflict with the uncontroverted factual evidence that the rail cars actually failed to operate as warranted. Where physical facts contradict expert opinions, the facts must govern. Testimony of an expert can not prevail over such physical facts; and neither court nor jury is permitted to credit testimony so contradicted. United States v. Donahue, 8 Cir.,

66 F.2d 838; United States v. Ingalls, 10 Cir., 67 F.2d 593.

"Necessarily, the weight of the opinion of an expert depends largely upon the facts upon which it is based. If supported by the evidence and by reason and common sense, it may carry great weight. If not justified by the evidence or by reason, it is entitled to no weight. Within reasonable limits, the weight of expert opinion is for the jury; but, if opposed to undisputed facts, common knowledge, and reason, it will not support a verdict." United States v. Hill, 8 Cir., 62 F.2d 1022, 1025.

The proffered expert testimony was properly excluded by the district court.

█ It is claimed that the government of Bolivia had no right to rescind the contract of sale more than three and a half years after delivery of the property sold, and that a judgment should not have been had against Differential based on such rescission. There, however, was no rescission by the government for the reason that the rail cars had never been accepted. The three months' period of Differential's responsibility for the specified mechanical performance of the cars would begin to run when the government finally took them over for operation. However, the government never took them over inasmuch as they did not comply with the explicit requirement that they should proceed up the Andes to Sucre under their own power, as a condition precedent to the government's acceptance of the cars.

█ Macdonald had been in communication constantly with Differential from time the cars arrived in Bolivia. When, after the first trial run, the gear boxes broke and propeller shafts cracked, Macdonald immediately cabled that these replacements were urgently required. The necessary parts, however, did not arrive in Bolivia until September, 1944, until which time, Macdonald was unable to go ahead with further tests. He then realized that there were fundamental defects in the cars, and kept reporting in detail the failures and the changes made to overcome the defects; and Differential kept *suggesting* remedies

to be put into effect. There is no merit in the claim that Differential did not have timely notice from Macdonald of the defects and failure to operate. At no time during the entire correspondence and relationship between the parties did Differential ever complain that it had not received adequate, reasonable notice of the defects in and failure of performance of the cars. As guarantor of Differential's warranty that the cars would operate as specified, Macdonald was justified in doing what he could to bring about the successful operation of the cars in accordance with Differential's warranties. Differential, therefore, is liable to Macdonald for the reimbursement of the expenses so incurred. See The Globe Indemnity Co. v. Schmitt, 142 Ohio St. 595, 53 N.E.2d 790.

Contrary to Differential's contentions, there was no substantial evidence that the failure of the cars to operate was due to sabotage, or negligent or incompetent operation of drivers. These claims were based upon correspondence between Macdonald and one of its employees, Rovira, in which the latter gave as his opinion, when the rail cars failed to operate during the first tests, that sabotage or negligence or incompetence of the operators was the cause of the damage and the defective performance. But no one knew what the real cause was. There was never at any time a successful trial run of the cars with the specified loads and trailer. Only after repairs and repeated tests did the reasons for the failure appear. The uncontroverted evidence on behalf of Macdonald was that, with the assistance of the most skilled mechanics familiar with the operation of engines and rail cars, the cars could never be made to operate in accordance with the requirements of the contract. Differential itself, throughout this period of unsuccessful tests, kept advising Macdonald from time to time how to remedy the cause of damage resulting from the excessively heavy shafts weighing on the gear boxes and the attendant vibration. When the real cause of the failure, due to mechanical design and lack of power, became obvious, it was apparent that the drivers had nothing

to do with the trouble, and when the subject of sabotage was investigated, it was found that nothing of the kind had occurred.

■ The district court properly excluded evidence of an alleged parol agreement between Macdonald and Differential that would have set aside the explicit written provisions of the contract finally executed. A written contract can not be varied or contradicted by parol evidence. Nor was there error in the admission into evidence of the Supreme Resolution heretofore mentioned. It was not received as a judgment against Differential but as the equivalent of a judgment against Macdonald. The latter, as Differential's agent, was the guarantor of the obligations under the contract. Where a principal refuses to exonerate its agent, and the agent is compelled to satisfy the claim against the principal, the agent is entitled to reimbursement from the principal.

"If the principal fails to defend after he has been given an opportunity to do so and if, after a defense in good faith, the agent is required to satisfy the claim, the issues therein involved are res judicata between the principal and agent." Restatement of the Law of Agency, Section 438. See Washington Gaslight Co. v. District of Columbia, 161 U.S. 316, 16 S.Ct. 564, 40 L.Ed. 712; Globe Indemnity Co. v. Schmitt, supra.

■ Appellant maintains, upon the authority of Scott et al.. v. United States, 6 Cir., 161 F.2d 1009, that the district court erred in directing a verdict in favor of Macdonald on the ground that a verdict for appellant would be required to be set aside as against the weight of evidence. The statement of the court made at the time of instructing the jury to return a verdict, is not to the effect contended for by appellant. In the context of the charge, it appears that the court was discussing appellant's claims that the trouble with the cars grew out of negligent or incompetent operation, and stated that the only evidence from which such an inference might be drawn consisted of some letters relating to individual instances of appellee tinkering with the mechanism of the cars, and of opinions expressed that some of the trouble might have been due to negligent or incompetent operation, together with mention of successful trial runs of the cars without the loaded trailers. After the above recital, the court continued: "and as to this evidence *the court is of the opinion that it is not of sufficient weight to justify the submission of this question in this case to the jury;* but a verdict based upon it for the defendant would be required to be set aside as against the weight of the evidence." There was no substantial evidence to warrant submitting the case to the jury, and the statement, as a whole, shows that the district court directed a verdict because of that fact. The observation, following the last semicolon of the above quotation, was an incidental remark, does not invalidate the correctness of the prior statement, and can not be construed as reversible error.

■ As to the defense of the statute of limitations, according to the evidence in the case, as a matter of Bolivian law, here controlling, it does not run against the government. Further, it is to be said that notwithstanding the assertions of Differential, there was no evidence of any collusion between Macdonald and the government of Bolivia prior to the promulgation of the Supreme Resolution.

The other claims and defenses of appellant, as set forth in the arguments and briefs, have been considered, but are found to be without merit.

Before the district court, the case involved many complexities of pleading and evidence, including, among other elements, determinations as to the laws of Bolivia, and many disputes and controversies that were resolved by the court during the progress of the trial. The mass of intricate documents and testimony was clarified and analyzed in forthright and admirable fashion by the district court at the conclusion of the proofs, and the jury was instructed to return a verdict in favor of appellee for the full amount claimed.

No error appearing, the judgment of the district court is affirmed.