COLUMB!AN NAT. LIFE INS. CO. v.
COMFORT.
No. 10484.

Circuit Court of Appeals, Eighth Circuit.
June 4, 1936.
Rehearing Denied June 29, 1936.

John S. Leahy, of St. Louis, Mo. (Lyon Anderson and Leahy, Saunders & Walther, all of St. Louis, Mo., on the brief), for appellant.

John. M. Holmes, of St. Louis, Mo. (Thompson, Mitchell, Thompson & Young and W. H. Woodward, all of St. Louis, Mo., on the brief), for appellee.

Before GARDNER, WOODROUGH, and THOMAS, Circuit Judges.

THOMAS, Circuit Judge.

Appeal from a judgment on· a verdict rendered in a suit on an accident insurance policy insuring "against loss resulting from bodily injuries, effected directly and independently of all other causes through accidental means."

The insured, Norman B. Comfort, husband of the beneficiary, appellee herein, was killed January 27, 1934, by a shot from a revolver. The appellant claims that he shot himself intentionally, and the appellee that it was accidental.

At the close of the evidence appellant moved for an instructed verdict on the grounds that: "(1) The evidence is insufficient to justify a finding that the death of the said Norman B. Comfort· was accidental * * *; (2) the preponderance of the evidence is consistent only with the theory of suicide and inconsistent with any reasonable hypothesis of death by accident."

The motion was denied by the court and, the jury having found for the plaintiff, judgment was entered on the verdict. The ruling of the court on the motion is assigned as error.

■■ The question before this court upon appeal, therefore, is whether there was any evidence upon which a verdict for appellee might properly be found. Lumbra v. United States, 290 U.S. 551, 54 S.Ct. 272, 78 L.Ed. 492. In deciding this question we assume as established all the facts that the evidence supporting appellee's claim reasonably tends to prove and that there should be drawn in her favor all the inferences fairly deducible from such facts.

■ The burden was upon appellee to prove that the cause of death was accidental. Lincoln National Life Ins. Co. v. Erickson, 42 F.(2d) 997 (C.C.A.8). She need not, however, prove by direct evidence that the death was accidental, but the fact may be deducible by inference from other facts proven, that is to say, it may be established by circumstantial evidence. United States Fidelity & Guaranty Co. v. Blum, 270 F. 946, 952 (C.C.A.9); Wells Fargo Bank & Union Trust Co. v. Mutual Life Ins. Co., 66 F.(2d) 890, 894 (C.C.A.9); Gunning v. Cooley, 281 U.S. 90, 94, 50 S. Ct. 231, 74 L.Ed. 720.

Counsel for appellee contend that she is aided in sustaining the burden cast upon her by the presumption against suicide. This is not true, however, in a case of this kind where there is evidence pro and con upon that issue which would sustain a verdict of a jury either way. Del Vecchio v. Bowers, 296 U.S. 280, 56 S.Ct. 190, 80 L.Ed. ——. The only office of the presumption is to control the result where there is an entire lack of competent evidence. Such presumption never has the quality of affirmative evidence; and when substantial evidence has been produced both in support of and in opposition to the theory of suicide, and it permits an inference either way upon that issue, the question of suicide or not must be determined by the jury upon the whole body of the evidence and not by the court.

The only question for determination upon this appeal is whether, considering the evidence as a whole, and viewed in the light of the foregoing rules, the jury was warranted in drawing the inference that the cause of death was accidental. So viewed the facts and circumstances in evidence bearing upon this issue may be stated briefly.

Insured was 45 years of age, married, and had a daughter 19 years of age. He lived at home with his family, and was happy and jovial. He was known as a man of determined and forceful character. He was engaged in the real estate business and had accumulated some property. The financial depression following the industrial collapse of 1929 had affected his affairs unfavorably. But he had become fee appraiser for the Home Owners' Loan Corporation in St. Louis county, Mo., several months prior to his death from which source he had a lucrative income. In January, 1934, the month in which he died, his earnings aggregated $1,525. He spoke optimistically of his business prospects to his friends on various occasions during the last six months of his life.

He was in good health, about 6 feet tall, weighed approximately 210 pounds, and was physically strong. He was popular with his friends and aspired to be the candidate of his political party for Congress. He was a major in the American army during the World War and had a record for services at the front in France.

Insured's death occurred at his home about 9:45 o'clock in the evening. He had dined at home that evening with his wife and daughter. They discussed sending the daughter away to school the next year, and planned a party for some friends for the following Thursday evening. A new automobile had been purchased by him which had not yet been delivered, and they discussed who would drive it most of the time. After supper he entertained a number of friends and business associates at a bridge party at his home. Those present were Frank Fisse, a lawyer; Hugh A. Bergs and Sylvester C. Judge, Jr., two of his business associates; Lon Harlow, an insurance agent; and Richard Gruner, an old friend. The party had been arranged for earlier in the week. They had played bridge together regularly for many years.

On this particular evening the first guests to arrive were Lon Harlow and Richard Gruner. They arrived about 8 o'clock and were met at the door by Mr. Comfort, and, according to Gruner's testimony, the insured was at the time in a jovial and happy mood.

He remarked to Gruner that the latter had never before been in his new house,

and after some further conversation proceeded to show him through it. They went to the second floor and stopped for a while in Mrs. Comfort's room. Mrs. Comfort had retired to her room before her husband's guests arrived. Gruner further testified that they then went through the balance of the second floor, including a room that he had fixed up for his mother-in-law, who was coming from California to live with them. They talked for a time about her coming, and Comfort asked Gruner to go with him to the station to meet her the following Tuesday. They all then went to the sunroom adjacent to the living room, and the bridge game began. Mr. Judge had not arrived at that time, and Mr. Comfort did not play in the first few hands. During the first rubber the cards were not running favorably for Mr. Fisse, and he remarked, "These are awfully bad cards; better get some different cards," to which insured replied, "Why, these are very fine cards." The cards they were playing with at the time carried on their backs advertising of Lon Harlow, who at the time was Mr. Fisse's partner. Insured then said, "These are very fine cards; these are Lon Harlow's cards," to which Mr. Fisse replied, "I want some with pictures on them." In the meantime, Mr. Judge had arrived, and Mr. Comfort joined in the game. At the conclusion of the third rubber there was a discussion of the play and thereafter insured, who had lost the rubber, remarked to Mr. Fisse, "I think you are right. I think some new cards are in order, and I will get some." That was about 9:30 o'clock. He then asked if anyone wanted a drink. All declined except Mr. Bergs, whereupon insured went to the kitchen and returned with a gin rickey, which he placed in front of Mr. Bergs. The latter tasted it and said, "Norman, you will never learn to make a drink for me," and when asked what was the matter with it, said, "You know what is the matter with it." Mr. Comfort then laughed and went to the kitchen and returned with a piece of lemon and squeezed it into Mr. Bergs' glass and said, "Now, try it," to which Bergs replied, after tasting the drink, "That is all right."

Mr. Comfort, the insured, then stepped out of the room, leaving his guests. His daughter saw him going upstairs. In from one to two minutes after he left the room the guests heard a sharp sound, a crash, a thud. One of the guests described it as a slam as if some one had slammed a door very violently, and then a jar as though a heavy object had fallen. Someone said, "I think it was a shot." The guests in a state of excitement went in search of insured. He was found shortly in his room on the second floor of his residence shot through the head, but still alive.

The insured's bedroom in which he was found opens off the hall on the second floor. The entrance from the hall is at the south end of the room. As one enters, the door swings to the right. The opening of the door is two feet eleven and one-half inches from the corner of the room. A closet is located on the east side of the room at the right of the entrance, the door to which is two feet four inches wide and one foot south of the corner of the room. The closet is three feet long from north to south and one foot eleven and one-half inches wide. It is furnished with a shelf one foot two and three-fourth inches wide and five feet four and one-eighth inches above the floor. Near the outer edge of the shelf is a pole to support clothes hangers. South of the closet, adjacent to the wall, was a high-boy dresser over which was a dim bedroom light, which was lighted at the time.

On the occasion in question the clothes pole was filled with wearing apparel consisting of suits and overcoats suspended on clothes hangers. On the floor next to the wall were several pairs of shoes. The shelf was covered with various articles, consisting of some decks of cards, a carton of matches, parts of a sun-lamp, a box of cartridges for a revolver, a pair of pajamas, and some other small articles. Two days before, Mrs. Comfort had seen the revolver from which the fatal shot was fired lying on this shelf.

The floor of the room was new smooth polished wood with no rugs or other floor coverings.

When Mr. Fisse arrived at the room, the door was closed and when he undertook to open it, he found it obstructed. On pushing it open a few inches, the insured was found lying on the floor on his back with his right shoulder and head against the door. In opening the door he was pushed back. His feet were in front of the closet door and about six inches from the threshold. Dr. Kieffer arrived in about five minutes. Insured was still breathing, but died within ten minutes without speaking. There was a bullet wound in his right temple one inch in front of and two inches above the external audi-

tory canal or opening in the ear. The dim bedroom light was going and there was no other light until the bright ceiling light was turned on later. When the body was moved a laceration was found on the back of the head and some blood on the glass door knob of the door between the room and the hall. There was also a bruise on the top of the left foot. Some playing cards were observed on the floor, lying under the calf of the left leg, and some matches at his feet. The revolver was found, after a search was made for it, lying on the floor against the base board along the north end of the closet.

Dr. Luke Tiernan, a physician and surgeon of 29 years' experience and coroner of the county, examined the body the following morning. He observed a burning or branding about the bullet entrance of approximately one-eighth of an inch or a little more at the upper margin and perhaps a little less at the lower margin, with some tatooing about the circle of the hole, having "perhaps a circumference of three inches or better." The tatooing was the result of impregnation of unburned powder. Dr. Tiernan testified as an expert and expressed the opinion that the muzzle of the gun producing the wound was at a distance of 12 to 15 inches from the head when it was fired. Dr. Harris who testified for the appellant and who performed an autopsy on the body the following April gave it as his opinion that the distance was not greater than one-half inch.

The revolver was an obsolete Smith & Wesson .32 caliber, hammerless or safety type. It had been owned by the insured for 3 or 4 years, and was secondhand when he acquired it. An examination of it later disclosed that it was rusty in most of its parts, but at the time of examination was in working order. To fire it required an eleven pound pull on the trigger and the application at the same time of some pressure on the safety device in the rear of the handle. When examined by Dr. Tiernan the day following the shooting, he testified that it was dirty, and that "there was considerable corrosion about the cylinder on both sides. It was corroded with a green corrode about the face and butt of the cylinder." John L. Wiget, a gunsmith of 47 years' experience, testified that he was familiar with this type of gun, and: "That type of gun can, under certain circumstances, be fired without even touching this so-called 'safety device.' It can be gummed up on the inside, on the mechanism, the trigger might be back, the hammer might be back just enough to hold the hammer back, the gum or gummed oil, you know, and by having on the shelf or anywhere like this, making a grab for it, why the hammer might go down, it would be a possibility. I have had such cases before. * * * The safety can be gummed up and stay down, by pushing it, and it will stay until probably some move is made, you know, by touching it, it will spring back. * * * A little gummed oil will make the hammer stick more or less. If the hammer were in that position and the gun was jarred in any manner the hammer would go down and that would fire the gun."

Equally well qualified witnesses for appellant, who examined the revolver some months later, testified that at that time, except for the rust and some corrosion, it was in good working condition; that it could not be fired except by operating it in the manner for which it was designed; and that it could not fire as a result of a fall or jar.

Since there was no one in the room with insured at the time the fatal shot was fired, it is certain that it was some act of his that caused the revolver to discharge. Whether it was intentional suicide or a possible accident depends theoretically upon whether the revolver was held within a half-inch of insured's head, as Dr. Harris who testified for appellant believes, or was at a distance of 12 to 15 inches when fired, as Dr. Tiernan believes. On this point, the jury was warranted in accepting, and doubtless did accept, the testimony of Dr. Tiernan. His opinion was based upon his own observation of the wound on the day following the accident, upon the appearance of the burn and powder marks surrounding the wound, and upon experience and study, and does not appear unreasonable. Experiments with the revolver showed that the flash or fire was projected 18 to 24 inches from the muzzle when it was fired, so that the burns and powder marks were possible at a distance of 12 to 15 inches.

Upon the whole body of the evidence we are of the opinion that the jury was justified in finding that the shot that killed insured was fired accidentally. In that case it was evidently fired from the closet shelf when insured was taking the playing cards therefrom. Just how it happened cannot be known in the absence of an eyewitness,

but the testimony of the gunsmith, Wiget, discloses how, in view of the rusty condition of the gun, it could have happened. Considering his testimony in connection with all the circumstances occurring the evening of the tragedy, including the want of suicidal motive, insured's apparent mental condition, his purpose in going to the closet to secure playing cards, the position of the cards and the revolver on the closet shelf before and their position after the accident, the dim light, the smooth floor, the position of the body after it had fallen, the height and condition of the closet shelf, the distance of the revolver from the head when fired, and the fact that the insured did not take the revolver with him but that it was present with the cards which he was in search of on the shelf with a mass of other articles, we hold that the question of accidental death or suicide was properly submitted to the jury and that the trial court properly overruled appellant's motion for an instructed verdict. Compare Stewart v. Travelers Protective Ass'n of America, 81 F.(2d) 25, 28 (C.C.A.5); New York Life Ins. Co. v. Miller, 65 App.D.C. 129, 81 F.(2d) 263; United States Fidelity & Guaranty Co. v. Blum (C.C.A.) 270 F. 946, and cases cited above.

■ The admission of certain evidence by the court over objection and exception of counsel for appellant is also assigned as error. Fred M. Tate, a witness for appellee called in rebuttal, was permitted to testify that, while acting as an agent of the United States secret service, he carried a .38 caliber revolver of the same type as the revolver in question and that, although in good working condition, it discharged upon dropping from a shoulder holster to the floor of an automobile in which he was sitting. No ground for the objection to the admission of this evidence was stated at the time the evidence was offered, but it is now urged that its admission brought into the case a collateral matter not legally relevant to the issues.

Assuming that the objection to the admission of this evidence now urged is valid, its admission does not constitute reversible error. Counsel specified no ground for his objection and exception at the trial. In the case of Stebbins v. Duncan, 108 U.S. 32, 46, 2 S.Ct. 313, 322, 27 L.Ed. 641, the Supreme Court said: "When a party excepts to the admission of testimony he is bound to state his objection

specifically, and in a proceeding for error he is confined to the objection so taken."

In Missouri, K. & T. Ry. Co. v. Elliott, 102 F. 96, 105 (C.C.A.8), this court, considering a similar assignment of error, remarked: "It will be observed that no ground for the objection is stated. The defendant simply 'objected,' which, for any legal purpose, is exactly equivalent to silence." (Citing authorities.)

■ Federal appellate courts will generally refuse to consider error assigning the overruling of objections to the admission of evidence as prejudicial error, where no ground of objection was stated. American Petroleum Co. v. Missouri Pac. Ry. Co., 25 F.(2d) 441, 442 (C.C.A.8); Waddell v. United States, 283 F. 409, 410 (C.C.A.8); District of Columbia v. Woodbury, 136 U.S. 450, 462, 10 S.Ct. 990, 34 L.Ed. 472; Toplitz v. Hedden, 146 U.S. 252, 255, 13 S.Ct. 70, 36 L.Ed. 961; Bank of Italy v. F. Romeo & Co., 287 F. 5, 9 (C.C.A.9).

For the reasons stated, the judgment appealed from is affirmed.