## NEW YORK LIFE INS. CO. v. WOLF et al.
### No. 10592.

Circuit Court of Appeals, Eighth Circuit.
July 30, 1936.

M. T. Woods, of Sioux Falls, S. D. (J. H. Voorhees, T. M. Bailey, and Roswell Bottum, all of Sioux Falls, S. D., on the brief), for appellant.

Julius Skaug, of Mobridge, S. D. (Pat Morrison, of Mobridge, S. D., on the brief), for appellees.

Before WOODROUGH and THOMAS, Circuit Judges, and DEWEY, District Judge.

DEWEY, District Judge.

The suit was brought against the appellant by certain beneficiaries of a life insurance policy issued by appellant to Rosina Wolf. The policy was issued and delivered on or about the 4th day of August, 1933, with provisions for the payment of $5,000 to the beneficiaries should the insured die while the policy was in force. The insured died on July 22, 1934, and due proofs of death were furnished the appellant.

As a defense for not paying the policy the appellant relied on its claim that the insured had made false representations in

her application for the policy and by reason thereof the policy had been fraudulently procured and delivered to the insured. The evidence showed that on July 28, 1932, Rosina Wolf made answers to the medical examiner for appellant that she had never undergone any surgical operation, been under observation or treatment in any hospital, consulted a physician for any ailment or disease of the brain or nervous system, consulted any physician for any ailment not included in her other answers, and had not consulted any physician within the last five years. That in truth and in fact she had consulted doctors in the Mayo Clinic for a pain in her back between the shoulder blades in the exact spot where the cancer that killed her was found. That in June, 1930, in that clinic she underwent an operation called curetement of the uterus, scraping of the womb, and cauterization of the cervic, and took subsequent treatments by radium to shrink a fibroid tumor of the uterus. She was hospitalized at least ten days at that time. She returned to that clinic in July of 1934 unable to walk, at which time a tumor of the spinal cord was located and removed; her death resulted therefrom in a few days.

Appellees made no serious claim at the trial that this was not the true situation, but pleaded and relied upon a claim that a legible copy of the written application for the insurance was not attached to the policy as required by a statute of the state of South Dakota and that the insurance company could not therefore rely upon any fraudulent representations made in such application.

At the trial appellee offered in evidence the insurance policy, including a copy of the written application, signed by Rosina Wolf and attached to and forming a part of the policy. It admittedly is a true and correct copy of the written application, and the only question submitted to the jury by the trial court was as to its legibility.

At the close of all the evidence the defendant, appellant here, moved for a directed verdict on the ground, among others, that the evidence is insufficient to sustain plaintiffs' avoidance or attempted avoidance of the evidence that the statements contained in the application for insurance were false; and the application attached to the policy is as a matter of law entirely legible and sufficient for the purposes of the South Dakota statute requiring a copy of such application to be a part of life insurance policies. To the overruling of this motion appellant assigns error.

Verdict and judgment resulted for appellee.

The statute involved is found in South Dakota Revised Code 1919, § 9340, as follows:

"No policy of life insurance * * * shall be issued in this state * * * unless the same shall contain the following provisions: * * *

"4. A provision that all statements made by the insured shall, in the absence of fraud, be deemed representations and not warranties and that no such statement shall avoid the policy unless it is contained in a written application and a copy of such application shall be indorsed upon or attached to the policy when issued."

▮ Appellant urges in argument that failure to attach a copy of the written application does not exclude a defense of fraud or concealment and that, as the policy was obtained by a fraud, it was void ab initio and the fraud estops the beneficiaries from maintaining suit on the void contract, and that the South Dakota statute has no application to fraudulent representations or concealments. It would appear from the decisions that these contentions of appellant are without merit. New York Life Ins. Co. v. Hamburger, 174 Mich. 254, 140 N.W. 510; Janunas v. Metropolitan Life Ins. Co., 239 Mich. 150, 214 N.W. 117, 118; Rauen v. Prudential Ins. Co., 129 Iowa, 725, 106 N.W. 198. Appellant's defense, however, stated in its answer is based squarely upon the false and fraudulent statements made in the written application and the insurance company did not call these questions, now urged, to the attention of the trial court or include such a suggestion in the assignment of errors, and these questions cannot be raised now for the first time on appeal. Wharton v. Aetna Life Ins. Co. (C.C.A.) 48 F.(2d) 37.

▮ The courts quite generally agree in construing similar statutes that to constitute such a copy it must be legible. Eastman v. Metropolitan Life Ins. Co., 228 Mich. 125, 199 N.W. 655; Janunas v. Metropolitan Life Ins. Co., supra; Arter v. Northwestern Mutual Life Ins. Co. (C.C.A.) 130 F. 768; New York Life Ins. Co. v. McCarthy (C.C.A.) 22 F.(2d) 241, 243; New York Life Ins. Co. v. Miller (C.C.A.) 73 F.(2d) 350, 97 A.L.R. 562.

What degree of legibility is required has also had the attention of the courts. In Arter v. N. W. Mutual Life Ins. Co. (C.C.A.) 130 F. 768, 769, a "copy" was defined as "any substance having any matter expressed or described upon it by marks capable of being read." And in New York Life Ins. Co. v. McCarthy (C.C.A.) 22 F. (2d) 241, 243, as "an instrument as enabled any person of. normal eyesight, who could read the English language, to ascertain that the insured's application for insurance contained the questions and answers which were set 'out in the special pleas." The test applied by the Supreme Court of Michigan is succinctly set out in the case of Janunas v. Metropolitan Life Ins. Co., supra, as follows: "Whether the reduced size photographic copy of the application attached to the policy serves the purpose of the statute involves the question of whether it can be read by a normal eye, under normal conditions, with reasonable ease. If it cannot be read by a normal eye, under normal conditions, with reasonable ease, then to hold it a compliance ·would render the statute meaningless." This rule follows that laid down in Eastman v. Metropolitan Life Ins. Co., 228 Mich. 125, 199 N.W. 655, and is the rule that was adopted by the trial court in this case and upon which his instruction to the jury was based; and follows an expression in the case of New York Life Ins. Co. v. Miller, 73 F.(2d) 350, 356, of this court that such a test expressed the true rule applicable in that case.

The facts in the Miller Case are, however, different. It is there said: "It is obvious, from a casual inspection of the policies, that a large portion of the papers attached as copies of the application were not capable of being read by persons of normal vision, without the aid of some magnifying instrument. As to the further claim that the statute is obeyed, if the copy of the original application attached to a policy and delivered to the assured is a true copy of its contents, regardless of its legibility, this would not be the test, if the original is plainly printed and written, in letters of fair size and easily legible, while the copy furnished is so reduced in size, or so dim or blurred that it can be read by persons of normal vision, only by the use of strong magnifying glasses."

Here there is no question other than that the written application attached to the policy is correct; there is no blurring or any necessity of applying a magnifying glass to read the copy of the written application. The facts here are consequently at variance with those in the Miller Case.

The only question is whether the photostatic copy of the written application so reduced the size of the type as to make it illegible. Appellee says in his argument that the copy lacks legibility for two reasons: First, it is a photostatic copy with white letters on a black background; and, second, the type is so reduced in size that it cannot be read with ease without the aid of some means of enlargement. The copy is about half the size of the original application and about the size of "4 point" type of the present standard of measuring type. While this is true as to the copy of the printed portions of the written application, the written answers are much larger (at least as large as Pica type), and a casual glance at the copy shows that the applicant answered all questions either "No," or "None," and gave herself a clear bill of health. While the type is small, the printing is clear and distinct and none of it blurred or faded.

It has been held by this and other courts that where the judge has no difficulty in reading the copy of the application, its legibility is sufficient. So in Arter v. Northwestern Mutual Life Ins. Co. (C. C.A.) 130 F. 768, 769: "But the learned trial judge appears to have experienced no difficulty in reading it, and, although it has become somewhat blurred—probably since the trial—we, too, have been able to read it. Under these circumstances there was nothing to be left to the jury." And in Adamos v. New York Life Ins. Co. (D.C.) 5 F.Supp. 278; Id. (D.C.) 5 F.Supp. 1019, 1020, the court "had no trouble in reading it, and do not think the applicant would." In First Trust Co. of St. Paul v. Kansas City Life Ins. Co., 79 F.(2d) 48, 54 (C. C.A.8), the court referred to the statement by the trial judge as follows: "It seems to me that the question of whether this is readable or not is not a question for an expert to say. I think that the normal eye can read it; I can read it very plainly and I think any member of the jury can." Judge Stone added: "The trial court was entirely right in determining that this was not a matter for expert testimony. There was nothing which an optometrist could properly add to the information as to the legibility of this application which the court and jury would not acquire by inspection thereof." And the court in New York ·Life Ins. Co. v. McCarthy, 22 F.

(2d) 241, 243, (C.C.A.5); discussing this question and the purpose of the act, said: "The manifest purpose of the above set out provision of the policy with reference to statements made by the insured and indorsing upon or applying or attaching to the policy when issued a copy of the written application was to enable the insured and the beneficiary to have at hand authentic information of statements made by the insured, which could be used in defense to a claim under the policy. Satterfield v. Fidelity Mutual Life Ins. Co., 171 Ala. 429, 55 So. 200; Eastman v. Metropolitan Life Ins. Co., 228 Mich. 125, 199 N.W. 655. It well may be concluded that the insured, or a beneficiary named in the policy, has the full benefit intended to be conferred by that provision where the only alleged statements of the insured which are sought to be made the ground of avoiding the policy, or to be used in defense of a claim under it, are plainly disclosed by what is attached to the policy when issued as a copy of the application for insurance."

■ Another question raised by appellant is as to the admissibility of the evidence of two expert optometrists who were permitted over apt objections on the part of the appellant to state that in their opinion the copy could not be read by a person with normal eye sight under normal conditions with reasonable ease. Appellant contends that these answers should not have been permitted, as the question calls for an answer to the ultimate issue submitted to the jury for its determination under the court's charge. Experts are not allowed to state their conclusions on the whole case as where under a hypothetical question an expert witness is asked to sum up the entire issues and determine the ultimate question for decision by the jury. United States v. Spaulding, 293 U.S. 498, 506, 55 S.Ct. 273, 79 L.Ed. 617. But the opinion here asked was not an opinion on the merits of the entire case, and it has been repeatedly held by this and other courts that where evidence will aid a jury in reaching a correct solution of the issues and is therefore properly a subject of expert evidence, it is no objection that the opinion elicited from the expert is on an issue or point to be decided by the jury. U. S. Smelting Co. v. Parry (C.C.A.) 166 F. 407, 411; Chicago, Rock Island & Pac. Ry. Co. v. Hale (C.C.A.8) 176 F. 71; Western Coal & Min. Co. v. Berberich (C. C.A.8) 94 F. 329; New York Life Ins. Co. v. Doerksen (C.C.A.10) 64 F.(2d)

240; State v. Cox, 172 Minn. 226, 215 N. W. 189; Marsh Wood Products Co. v Babcock & Wilcox Co. et al., 207 Wis. 209, 240 N.W. 392, 400.

■ The ultimate question on this issue has to do with whether the copy was obviously readable. If it was not, we are satisfied that expert evidence was properly admitted on this point. Where the question is in doubt and a fact to be determined by the jury, such expert evidence is allowable. Eastman v. Metropolitan Life Ins. Co., and Jananus v. Metropolitan Life Ins. Co., both supra. But where the copy is plain and readable, it is not admissible. First Trust Co. of St. Paul v. Kansas City Life Ins. Co., and Adamos v. New York Life Ins. Co., both supra.

It is to be noted that the experts did not say that they could not readily read the photostatic copy of the application attached to the policy, but were asked to and were permitted to give their reasons for their answers to the hypothetical question as they did answer it. Dr. Sarchet, after stating the facts which qualified him as an expert of the eye, ear, nose, and throat, said: "In our work in the eye we have certain standards that we use in determining the normal vision or lack of it in patients that consult us. I will state generally how we determine the normal vision and what can be read and cannot be read. In examining a patient for eye conditions, there is what we call the distant vision and the near vision or vision for reading. In the distant vision they must read a certain sized type at a distance of from ten, fifteen or twenty feet, and their near vision for reading they must be able to read number one type at a distance of thirteen inches in order to be normal." While Dr. Alway, after a similar qualification, says: "In my work of the eye I have certain standards by which I can reckon the normal vision and eyesight of people. I use that in ascertaining their ability to read, or the lack of it, and also in fitting them glasses so that you can get back to them the normal vision that people are supposed to have."

It is clearly evident then that the opinions of these experts were not based upon the question whether this copy of the application could be read, but whether it would be used for normal reading. There would perhaps be some question of whether or not the smallness of the type would not make a continuous reading of it irksome or difficult. While the type was small, the

printing is as clear and distinct as an etching, and though it would not be of a size that would make reading easy or pleasant for a considerable time, no difficulty is encountered in a short perusal. But the question here is not whether or not the type is of that size that it might be read for any continuous length of time, but whether it was legible for the purposes intended by the statute.

An obvious appearance of a physical fact needs no elucidation by an expert. The members of this court have no difficulty in reading the copy of the application attached to the policy and we are satisfied there was no fact question that should have been presented to the jury and that the expert testimony was inadmissible.

Reversed.