## SVENSON et al. v. MUTUAL LIFE INS. CO. OF NEW YORK.

No. 10742.

Circuit Court of Appeals, Eighth Circuit.

Jan. 27, 1937.

442

Gale B. Braithwaite, of Sioux Falls, S. D. (James O. Berdahl and U. S. G. Cherry, both of Sioux Falls, S. D., on the brief), for appellants.

M. T. Woods, of Sioux Falls, S. D. (J. H. Voorhees, T. M. Bailey, and Roswell Bottum, all of Sioux Falls, S. D., on the brief), for appellee.

Before SANBORN, WOODROUGH, and BOOTH, Circuit Judges.

SANBORN, Circuit Judge.

This is an appeal from a judgment entered upon a directed verdict for defendant in an action to recover double indemnity for accidental death under a $10,000 policy of life insurance payable to the estate of the insured.

Olander Benson was the insured. He died February 22, 1934. His executors claimed double indemnity on the ground that his death was accidental under the terms of the policy. The company paid the face of the policy, denying that the death was accidental. The executors brought this action under the double indemnity provision of the policy, which provided for an additional $10,000 upon receipt by the company at its home office of "due proof that such death resulted directly from bodily injury received after the date of issue of this policy, independently and exclusively of all other causes, and that such bodily injury was effected solely through external, violent and accidental causes, and that such death occurred within sixty days after the date of such bodily injury."

The company in its answer set up the following provision of the policy: "Provided, however, that this Double Indemnity shall not be payable in the event of the Insured's death as a result of military or naval service in time of war nor shall it be payable in the event of the Insured's death at any time by his own act, whether sane or insane, nor if such death be caused directly or indirectly, wholly or partly, by riot, insurrection or war or any act incident thereto, nor if such death be a result of participation in aeronautics or submarine operations, nor if such death result from any violation of law by the insured, or from police duty in any military, naval or police organization, or directly or indirectly from bodily or mental infirmity or disease of any sort." It then alleged that "Olander Benson came to his death, directly or indirectly, from bodily and mental infirmity and disease and by his own act."

The issue to be tried was: Did Olander Benson die as a result of bodily injuries effected solely and exclusively through external, violent, and accidental causes, independently of all other causes, and not by his own act and not as a result of disease?

The burden of proving that the death of the insured was due solely to external, violent, and accidental causes (unexpected causes or means which produced that result) was upon the plaintiffs. Lincoln Nat. Life Ins. Co. v. Erickson (C.C.A. 8) 42 F.(2d) 997, 1000; Columbian Nat. Life Ins. Co. v. Comfort (C.C.A.8) 84 F.(2d) 291, 292.

Upon the trial, the court below, at the close of plaintiffs' case, being of the opinion that they had not sustained the burden of proof, directed a verdict for defendant. Whether the court erred in this regard is the main question before us.

In deciding whether there was error in directing a verdict for the defendant, several matters must be kept in mind: (1) All facts that the plaintiffs' evidence reasonably tends to prove must be assumed to have been established, and all inferences fairly deducible from such facts must be drawn in their favor. Lumbra v. United States, 290 U.S. 551, 553, 54 S.Ct. 272, 273, 78 L.Ed. 492; Illinois Power & Light Corporation v. Hurley (C.C.A.8) 49 F.(2d) 681, 682, 686; Colum-

bian Nat. Life Ins. Co. v. Comfort (C. C.A.8) 84 F.(2d) 291, 292. (2) Accidental death need not be established by direct evidence, but may be deduced from other facts proven, which means that, like any other fact, it may be established by circumstantial evidence. United States Fidelity & Guaranty Co. v. Blum (C.C.A. 9) 270 F. 946, 952; Mutual Life Ins. Co. v. Hatten (C.C.A.8) 17 F.(2d) 889, 890; Wells Fargo Bank & Union Trust Co. v. Mutual Life Ins. Co. (C.C.A.9) 66 F. (2d) 890, 894; Gunning v. Cooley, 281 U.S. 90, 94, 50 S.Ct. 231, 233, 74 L.Ed. 720; Columbian Nat. Life Ins. Co. v. Comfort, supra. (3) Evidence equally consistent with the hypothesis that the death was accidental and with the hypothesis that it was not accidental tends to establish neither. Ewing v. Goode (C. C.S.D.Ohio) 78 F. 442, 444; Gunning v. Cooley, supra; Stevens v. The White City, 285 U.S. 195, 204, 52 S.Ct. 347, 350, 76 L.Ed. 699; Eggen v. United States (C. C.A.8) 58 F.(2d) 616, 620; Deadrich v. United States (C.C.A.9) 74 F.(2d) 619, 622; Claywell v. Inter-Southern Life Ins. Co. (C.C.A.8) 70 F.(2d) 569, 571. (4) Issues that depend upon the credibility of witnesses and the weight of evidence are to be decided by the jury. (5) The question whether an insured has died as the result of accidental causes is one of fact for the jury if that question is uncertain either because of a conflict in the evidence or because fair-minded men will honestly draw different conclusions from the undisputed facts. Travelers' Ins. Co. v. Melick (C.C.A.8) 65 F. 178, 181, 27 L.R.A. 629; Gunning v. Cooley, supra; Best v. District of Columbia, 291 U.S. 411, 415, 54 S.Ct. 487, 489, 78 L. Ed. 882; Southern Pac. Co. v. Ralston (C.C.A.10) 67 F.(2d) 958; Mutual Life Ins. Co. v. Hatten (C.C.A.8) 17 F.(2d) 889, 893, supra; Crookston Lumber Co. v. Boutin (C.C.A.8) 149 F. 680, 685; United States Can Co. v. Ryan (C.C.A.8) 39 F.(2d) 445, 446; Illinois Power & Light Corporation v. Hurley (C.C.A.8) 49 F. (2d) 681, 686. (6) It is only where the evidence upon any issue is all on one side, or so overwhelmingly on one side as to leave no room to doubt what the fact is, that the court should direct a verdict. People's Savings Bank v. Bates, 120 U.S. 556, 562, 7 S.Ct. 679, 30 L.Ed. 754; Southern Pac. Co. v. Pool, 160 U. S. 438, 440, 16 S.Ct. 338, 40 L.Ed. 485; Gunning v. Cooley, supra.

The facts disclosed by the evidence are as follows:

Olander Benson, on February 22, 1934, was a farmer 59 years of age, about 6 feet tall, and weighing 220 pounds. He owned and operated a 1,200-acre farm about three miles from Sioux Falls, S. D., upon which he lived. He had about 210 cows and 250 hogs on the place. He did not do the heavy manual work upon the farm, but managed it and had three employees. It was his custom each day to drive two of his daughters, who were school teachers, in to Sioux Falls to their work and to call for them each afternoon when school was over. His health was apparently good, although he was occasionally observed to be out of breath after exerting himself in walking or cranking his car, and during the last year of his life he had been troubled with gas on his stomach. He had been recently examined for the reinstatement of the policy in suit and another policy issued by the same company, and the policies had been reinstated and were in force when he died. He had had no medical attention since the fall of 1932, when he complained of gas on his stomach and constipation. He was well the next day. No one observed any change in his physical condition while he was alive.

In the afternoon of February 22, 1934, he drove to Sioux Falls for his daughters and brought them home, arriving at about 5 o'clock. He planned to drive his daughter Florence in to Sioux Falls for a 6:30 p. m. engagement, and then to drive back to the farm to take his wife and daughter to church in Sioux Falls. He usually made the rounds of the barns and other buildings on the farm every day after bringing his daughters from school. He was apparently last seen alive about 5:30 p. m. by Mr. and Mrs. Van Aalsburg, who had moved into a building connected with the pump house in the middle of the yard on the Benson farm. Benson had hired Van Aalsburg to work for him commencing March 1, 1934. He told the Van Aalsburgs, when they saw him in front of their quarters, that if they needed anything, to let him know and he would get it the next morning, and that as soon as they were settled he would arrange to have Van Aalsburg start work. He left Van Aalsburgs' door, walked east, and stepped through the fence into the yard where the cattle were. Mr. Ben-

son did not appear at the house in time to take Florence to town, and his daughter Effie took the car and drove her in shortly after 6 o'clock. Effie stopped at a garage for a few minutes and then drove home, arriving probably some time after 6:30 and before 7. Mr. Benson had not come to the house, and Effie told Gunnar Olson, one of the employees, to look for him. The sun was down, but it was not dark outside. Olson went to the hog house, a long low shed, facing west and adjoining the cattle yard. This house contained young hogs, the heaviest of which would weigh 150 pounds. There was a door at the end of the house, which was fastened, and an opening on one side leading into the yard, across which a bar was usually nailed to keep the cattle out. Whether the bar was up that night is not known, but it was down the next morning. Olson entered the hog house by the end door, which he found fastened. It was dark inside, and at first he saw nothing but hogs. After he had chased them out, he saw Mr. Benson's body about 25 feet inside upon the ground, lying face up close to the north wall with the head closest to the wall and the legs pointing southeast. About a dozen hogs had been around the body, at the time Olson came in, eating it. Mr. Benson had been dressed in overalls, jacket, and underwear. The jacket and underwear were torn on the right side. The flesh had been eaten from his face and neck and partially from his hands. There was a hole in his chest on the right side, such as could have been made by a cow's horn, and there were many parallel scratches upon his chest, obviously made by the feet of the hogs. Olson, after finding the body, called for help, and Harry Nagel and Carl Olson came. The three men carried the body from the hog house to the cow barn. The body was "kind of cold and clammy like" at that time. There was blood on Benson's body all over the head and part of the chest. In carrying the body to the cow barn, Nagel got blood on his clothes from the head. The undertaker, who was also the coroner, called for the body that same evening. About half an hour after he had taken the body to his undertaking establishment, he undressed it. There was blood "underneath the clothing." There was a wound in the right chest and the face was "pretty well gone." The clothing was soaked with dampness and manure and the blood on it was where it had been against the chest. Dr. O. Charles Erickson saw the body at the embalming room "about 6:30 p. m." of the 22d. This was before the clothes were removed. There was considerable blood around the clothes, around the neck, and the clothes on the right side of the body were blood stained. The body was slightly warm. Rigor mortis had not set in. He saw the wound in the chest, which had broken a rib and collapsed the right lung. A post mortem examination was performed the following day, at about 5:30 p. m., by Dr. O. Charles Erickson, Dr. Emil Erickson, and Dr. Hyden, three duly qualified and licensed physicians of the State of South Dakota. They all testified upon the trial as to the nature and extent of the examination which they made to ascertain the cause of death. It is unnecessary to give the detail of it. They found the horrible mutilations referred to and the wound which had caused the fracture of the fifth rib. They found no embolism and no thrombi in the blood vessels. The heart appeared normal. There was a moderate amount of sclerosis and of calcification of the aorta for a man of the insured's age. The coronary arteries were not closed up. There was a moderate amount of sclerosis and calcification in those arteries. There were no infarcts or abnormalities in the heart muscle. The heart valves were competent and no obstructions were found in the larger blood vessels leading to the heart. There were no foreign bodies in the esophagus, trachea, or windpipe. An examination of the head and brain revealed no fractures, no hemorrhages, and no evidence of injuries or disease. The abdominal viscera were all normal except the spleen, which was larger than normal. All of the doctors who performed the post mortem expressed the opinion that the death was caused by the wound in the right chest, animal mutilation of the face, neck, and hands, and the resulting shock and hemorrhage, and that prior to the infliction of the wounds and the mutilations the insured was alive. They also expressed the opinion that the death was not caused or contributed to by any disease, and that the force which caused the wound in the chest was an external force. They stated the bases for their opinions, which in brief were their findings on the autopsy and the apparent bleeding of the wounds at the time of their infliction and thereafter.

■ These opinions of the doctors were expressed over the objection of the defendant that they invaded the province of the jury. The testimony was, of course, entirely competent. That the final determination of the cause of death was for the jury did not render incompetent or inadmissible the opinions of medical experts as to the cause of death.

■ Where the matter under inquiry is properly the subject of expert testimony, it is no objection that the opinion elicited is upon an issue or point to be decided by the jury. United States Smelting Co. v. Parry (C.C.A.8) 166 F. 407; Chicago, R. I. & P. Ry. Co. v. Hale (C.C.A.8) 176 F. 71; Western Coal & Mining Co. v. Berberich (C.C.A.8) 94 F. 329; Eastern Transportation Line v. Hope, 95 U.S. 297, 24 L.Ed. 477; Illinois Power & Light Corporation v. Hurley (C.C.A.8) 49 F. (2d) 681, 685; New York Life Ins. Co. v. Doerksen (C.C.A.10) 64 F.(2d) 240, 241; London Guarantee & Accident Co. v. Woelfle (C.C.A.8) 83 F.(2d) 325, 337; New York Life Ins. Co. v. Wolf (C.C. A.8) 85 F.(2d) 162, 165.

■ Where it clearly appears that an expert's opinion is opposed to physical facts or to common knowledge or to the dictates of common sense or is pure speculation, such an opinion will not be regarded as substantial evidence. United States v. Hill (C.C.A.8) 62 F.(2d) 1022, 1025, 1026; Ocean Accident & Guarantee Corp. v. Moore (C.C.A.8) 85 F.(2d) 369, 375; Wisconsin Alumni R. Foundation v. George A. Breon & Co. (C.C.A.8) 85 F. (2d) 166, 171; United States v. Spaulding, 293 U.S. 498, 506, 55 S.Ct. 273, 276, 79 L.Ed. 617. The weight of expert testimony, however, is ordinarily for the jury. United States v. Hill, supra, 62 F. (2d) 1022, 1025, 1026; Mutual Life Ins. Co. of New York v. Still (C.C.A.8) 78 F.(2d) 748, 749, 750; London Guarantee & Accident Co. v. Woelfle, supra, 83 F. (2d) 325, 337; Metropolitan Life Ins. Co. v. Armstrong (C.C.A.8) 85 F.(2d) 187, 190.

■ What caused or could have caused the death of the insured was a pertinent medical question and a proper subject for expert testimony, New York Life Ins. Co. v. Doerksen (C.C.A.10) 64 F.(2d) 240, 241; London Guarantee & Accident Co. v. Woelfle, supra, 85 F.(2d) 325, 337, the weight of which would be for the jury.

Taking that view of the evidence most favorable to the plaintiffs, it established that Olander Benson came to his death from bodily injuries due to external and violent causes, exclusive of any disease. Travellers' Ins. Co. v. McConkey, 127 U. S. 661, 666, 8 S.Ct. 1360, 32 L.Ed. 308. The circumstances which brought about his death are not established. It is apparent that the witnesses for the plaintiffs all believe that there was a cow in the hog house when Benson entered it in the dark or dusk of the evening; that this cow, in trying to get out, horned him in the right chest, causing the wound and knocking him to the floor, where he lay unconscious or helpless among the hogs, which killed him. There was evidence that cows sometimes went into the hog house; that Benson had at times been seen chasing them out; that a young heifer weighing some 800 pounds was found the following morning with an unexplained wire around her neck; that the wound in the chest was such as a cow's horn would make, and not such as a hog's hoof or jaw would make; that there were no projections on the floor of the hog house which would account for the wound, and no weapons or other things at or near the scene of death which would account for it.

The situation here is substantially the same in principle as confronted this court in Columbian Nat. Life Ins. Co. v. Comfort (C.C.A.8) 84 F.(2d) 291, 294, in which it was said: "Just how it happened cannot be known in the absence of an eyewitness, but the testimony of the gunsmith, Wiget, discloses how, in view of the rusty condition of the gun, it could have happened." The language used by the late Judge Kenyon in Mutual Life Ins. Co. v. Hatten (C.C.A.8) 17 F. (2d) 889, at 893, is also pertinent: "No one saw the accident. It will ever remain a mystery, and there must be more or less surmise as to how it happened." If the plaintiffs, in order to recover, were obliged to prove not only that death was accidental, but exactly what caused the accident, a different question would be presented.

It is not contended by the defendant that the evidence would justify a conclusion that the insured inflicted the wound upon himself or that he voluntarily permitted himself to be eaten; and obviously such a thing could not have happened.

If Olander Benson died from external violence, his death must have been (1) suicide, (2) homicide, or (3) an accident. The evidence is inconsistent with suicide. It does not point to homicide, and that is not to be presumed. Travellers' Ins. Co. v. McConkey, 127 U.S. 661, 667, 8 S.Ct. 1360, 32 L.Ed. 308.

The contention that the evidence is consistent with death by disease is squarely in the teeth of the testimony of plaintiffs' experts, which this court must accept as true. The fact that the insured had some arteriosclerosis does not establish any causal connection between the disease, if it was a disease, and the death. Mutual Life Ins. Co. v. Still (C.C.A.8) 78 F.(2d) 748, 750; Preferred Accident Ins. Co. v. Combs (C.C.A.8) 76 F.(2d) 775, 780; Metropolitan Life Ins. Co. v. Siebert (C.C.A.8) 72 F.(2d) 6, 7.

Our conclusion is that there was substantial evidence of accidental death.

Other questions we think need not be decided, since they are unlikely to arise upon a new trial.

The judgment is reversed and the case remanded for a new trial.